Rubén Berríos Martínez et al., demandantes y apelantes, v. Pedro Rosselló González et al., demandados y apelados; Partido Popular Democrático, demandantes v. Pedro Rosselló González, demandado; Eudaldo Báez Galib y Movilización Civil, demandantes y peticionarios, v. Comisión Estatal de Elecciones y otros, demandados y recurridos.

Números: AC-94-644
AC-94-653
CE-94-645

Resuelto: 30 de septiembre de 1994

196

*Carlos I. Gorrín Peralta, Manuel Rodríguez Orellana, Gilberto Concepción Suárez, Eudaldo Báez Galib* y *Eduardo René Estades,* abogados de los recurrentes; *Pedro A. Delgado Hernández, Procurador General, Carlos Lugo Fiol, Subprocurador General,* y *David Rivé Rivera,* abogados de los recurridos.

El Juez Asociado Señor Hernández Denton emitió la opinión del Tribunal.

Al amparo de la facultad que nos otorga el Art. V de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, de ser los intérpretes máximos de la Constitución, tenemos el deber de garantizar y vigilar que las enmiendas a nuestra Ley Suprema cumplan con lo dispuesto en el Art. VII de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1. Hoy nos corresponde la ineludible obligación de determinar si la Ley Habilitadora del Referéndum Sobre Enmiendas a la Constitución de Puerto Rico de 1994 (en adelante Ley Habilitadora), Ley Núm. 49 de 2 de agosto de 1994 (16 L.P.R.A. sec. 956 *et seq.*) cumple con los requisitos de la Sec. 1 del Art. VII de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, que reglamenta cómo deben hacerse las enmiendas a la Constitución.

Al interpretar las normas que establece el Art. VII

de nuestra Constitución, *supra*, para la aprobación de las enmiendas, partimos de la premisa de que la Convención Constituyente formuló un procedimiento para que el pueblo pudiese introducir modificaciones a nuestra Ley Suprema para adaptarla a las exigencias y los requerimientos de la realidad. También partimos de la premisa de que, en el ejercicio de su poder soberano, el pueblo incluyó en el Art. VII de la Constitución, *supra*, unos límites expresos e implícitos sobre el alcance de las enmiendas que se podrían incorporar.

El Informe de la Comisión de Preámbulo, Ordenanzas y Procedimientos de Enmiendas a la Constitución, sobre Enmiendas elocuentemente describió el propósito del Art. VII de la Constitución, *supra*:

Nuestra proposición sustituta sobre procedimientos de enmiendas a la constitución persigue dos objetivos básicos: hacer de la constitución un documento estable, de mayor autoridad y dignidad que una ley, a la vez que un instrumento flexible, sensible a cambios fundamentales en la opinión pública y en las necesidades sociales.

Una constitución, desde luego, es más que una ley ordinaria, es la ley que gobierna al gobierno. Sus disposiciones limitan las leyes que hace el gobierno. La estabilidad de la constitución es esencial al adecuado desarrollo, dentro de un régimen de ley, de las instituciones y principios que en ella se organizan y establecen. Las constituciones deben estar fuera del alcance de la pasión súbita y el juicio pasajero y, siendo tan alto el fin que ellas cumplen, el procedimiento para enmendarlas debe ser lo suficientemente difícil como para invitar al análisis sereno y cuidadoso.

Por otro lado, las constituciones deben corresponder fielmente a la realidad social que sirven. Disparidades iniciales profundas entre la realidad y el documento, o la incapacidad de una constitución para crecer con la sociedad a la cual rige llevan inevitablemente al deterioro de la constitución y a su abandono. Toda constitución debe contener el mecanismo necesario para responder a cambios fundamentales en el medio social. Si bien el procedimiento para enmendar la constitución debe ser lo suficientemente rígido para impartirle estabilidad a la constitución y distinguirla de las leyes ordinarias, el procedimiento a su vez debe ser lo suficientemente flexible para que

la constitución pueda ceder ante una opinión pública informada y consciente y continuar así reflejando los postulados esenciales de vida de la comunidad. 4 Diario de Sesiones de la Convención Constituyente 2559 (1951). (Informe de la Comisión de Preámbulo, Ordenanzas y Procedimientos de Enmiendas a la Constitución, sobre Enmiendas.)

■ Nuestra tarea es particularmente delicada en este caso porque una de las enmiendas constitucionales sometidas a la consideración del pueblo propone un cambio en la composición de esta Curia. Aunque le corresponde al Tribunal Supremo ser el intérprete final de la Constitución, siempre debemos resolver las controversias ante nos con mucha prudencia, conscientes de las limitaciones que tiene el Poder Judicial y con deferencia y respeto hacia las otras Ramas que componen la forma republicana de gobierno. Lo hacemos, además, con el pleno convencimiento de que nuestra labor no es juzgar la sabiduría de las enmiendas propuestas, sino su constitucionalidad. Al así obrar, damos cumplimiento a nuestra Constitución, reflejo de la voluntad del Pueblo de Puerto Rico, según expresada inicialmente en la Convención Constituyente y ratificada poco después mediante referéndum celebrado hace aproximadamente cuarenta (40) años.

Recurren ante nos el Partido Independentista Puertorriqueño, el Partido Popular Democrático y el Lcdo. Eudaldo Báez Galib cuestionando la sentencia del Tribunal Superior que declaró sin lugar todas las demandas incoadas en las cuales se impugnaba la validez constitucional de la Ley Habilitadora y la campaña de orientación de la Comisión Estatal de Elecciones (en adelante Comisión Estatal) sobre las proposiciones de enmienda.

Evaluados cuidadosamente los escritos de todas las partes, modificamos la sentencia recurrida y declaramos inconstitucional únicamente la Resolución Concurrente de la Cámara Núm. 14 de 13 de diciembre de 1993 y las partes de la Ley Habilitadora que proponen añadir una Sec. 20 al Art. VI de la Constitución del Estado Libre Asociado,

L.P.R.A., Tomo 1, para fijar un máximo al número de términos que una persona podrá servir en los cargos electivos de Gobernador, Legislador y Alcalde. En vista de que estas proposiciones de enmienda violan el Art. VII de la Constitución, *supra*, no podrán ser sometidas para la consideración del pueblo. Este dictamen no impide que la Asamblea Legislativa revise el contenido de estas propuestas de acuerdo con los pronunciamientos de esta opinión y los someta nuevamente a la consideración del pueblo.

También, a tenor con el deber afirmativo de desarrollar una campaña de información y orientación sobre el contenido de las enmiendas, impuesto a la Comisión Estatal por el Art. 7 de la Ley Habilitadora, 16 L.P.R.A. sec. 956f, dicho organismo deberá darle participación plena, directa y efectiva a los Comisionados Electorales en todas las etapas de esta actividad, incluso el contenido y su forma. Además, la Comisión Estatal, utilizando todos los medios de comunicación y técnicas de difusión pública a su alcance, deberá divulgar de forma masiva unos mensajes educativos donde se les explique a todos los electores el significado de las enmiendas y las razones para votar a favor y en contra de cada una de ellas.

Con estas modificaciones, procede que se celebre el referéndum en la fecha señalada y se le permita al Pueblo de Puerto Rico y a la historia juzgar finalmente la sabiduría de las proposiciones de enmiendas.

## I

El 2 de agosto de 1994 la Asamblea Legislativa de Puerto Rico aprobó la Ley Habilitadora, mediante la cual se autoriza la celebración de un referéndum el 6 de noviembre de 1994 en el cual los electores debidamente inscritos expresarán su aprobación o rechazo a varias enmiendas a la Constitución del Estado Libre Asociado de Puerto Rico.

La primera, la Resolución Concurrente de la Cámara Núm. 14, *supra*, propone añadir una Sec. 20 al Art. VI de la Constitución, *supra*, para establecer unos límites al número de términos que una persona podrá servir en cada uno de los cargos siguientes: Gobernador, Senador, Representante a la Cámara y Alcalde. El cargo de Gobernador se limita a dos (2) términos y los demás se limitan a tres (3). La Resolución Concurrente de la Cámara Núm. 32 de 16 de mayo de 1994 propone una enmienda al Art. II, Sec. 11, Pár. 5 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, para limitar el derecho absoluto a la fianza. La Resolución Concurrente del Senado Núm. 44 de 6 de julio de 1994 propone una enmienda al Art. V, Sec. 3 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, para fijar en nueve (9) el número de Jueces del Tribunal Supremo de Puerto Rico y, a su vez, derogar la disposición que provee que "[e]l número de sus jueces sólo podrá ser variado por ley, a solicitud del propio Tribunal Supremo". Art. V, Sec. 3, Const. E.L.A., *supra*, ed. 1982, pág. 356.

Oportunamente, varias acciones fueron incoadas ante el Tribunal Superior contra el Hon. Pedro Rosselló González, Gobernador de Puerto Rico, la Comisión Estatal y el Estado Libre Asociado (en adelante E.L.A.), entre otros. En síntesis, se presentaron cuatro (4) demandas impugnando la constitucionalidad de la Ley Habilitadora. Mediante demanda de sentencia declaratoria e *injunction*, comparecieron como demandantes el Lic. Rubén Berríos Martínez, por sí y en representación del Partido Independentista Puertorriqueño (en adelante P.I.P.), y el Lic. Manuel Rodríguez Orellana, por sí y como Comisionado Electoral del P.I.P. (demanda del P.I.P.). Además, presentaron una demanda Movilización Civil y el Lic. Eudaldo Báez Galib, en su capacidad de elector y en representación de dicha agrupación ciudadana (demanda de Báez Galib). Por su parte, también incoaron una demanda el Partido Popular Democrático (en

adelante P.P.D.) y su Comisionada Electoral, Modesta Alberty Vélez (demanda del P.P.D.). Una cuarta demanda fue presentada por Isabel Pérez Pérez, una serie de electores y por varias organizaciones (demanda de Isabel Pérez).[1] En todas las demandas se solicitó una declaración de inconstitucionalidad de la Ley Habilitadora y que se prohibiera la celebración del referéndum.

En la alternativa, el P.I.P. solicitó que se asignara una cantidad razonable del balance de los fondos asignados a la Comisión Estatal para los tres (3) partidos políticos para su campaña de orientación o, en la alternativa, que se asignara el balance de los fondos de la Comisión Estatal a las oficinas de los tres (3) Comisionados Electorales, para que fueran éstos quienes determinaran el contenido y la forma de la campaña de orientación de la Comisión Estatal. Por su parte, Báez Galib solicitó que de no prohibirse la celebración del referéndum, se prohibiera llevar a éste aquellas disposiciones inconstitucionales y se tomaran las medidas necesarias para la celebración de un referéndum válido según la ley y la Constitución.

Específicamente, el P.P.D., Báez Galib e Isabel Pérez alegaron que la Ley Habilitadora viola el Art. VII, Sec. 1 de la Constitución de Puerto Rico, *supra*, al presentar más de tres (3) enmiendas. Esta cláusula constitucional limita a tres (3) el número de proposiciones de enmienda constitucional que pueden ser sometidas al electorado en un referéndum.

El P.I.P., Báez Galib y el P.P.D. sostuvieron que la Ley Habilitadora es inconstitucional por ordenar a la Comisión Estatal realizar una campaña de información y orientación sobre el contenido de las enmiendas y, a la vez, no proveer financiamiento público a los partidos políticos. Además, el

---

[1] Estas organizaciones son: los Consejos de Estudiantes de la Escuela de Derecho y de la Facultad de Ciencias Sociales de la Universidad de Puerto Rico; la Asociación Nacional de Estudiantes de Derecho; la Unión de Juventudes Socialistas; la Federación de Universitarios Pro Independencia, y el Frente de Juventudes en Defensa de los Derechos Democráticos.

P.P.D. e Isabel Pérez impugnaron las restricciones que la ley establece a las contribuciones que pueden realizarse a las entidades que llevan a cabo la campaña en relación con el referéndum.

Con respecto a la proposición o enmienda sobre el derecho a la fianza, el licenciado Báez Galib, el P.P.D. e Isabel Pérez alegaron que tal enmienda sería inconstitucional por su vaguedad y ambigüedad, infringiendo así las cláusulas constitucionales del debido proceso de ley y de la igual protección de la las leyes, y coartando el derecho del elector a ejercer su voto de modo informado e inteligente.

En cuanto a la papeleta que se utilizará, el P.P.D. sostuvo que ésta viola la cláusula de la igual protección y del derecho al voto por no proveer para la utilización de símbolos en beneficio de aquellas personas que no saben leer y escribir. Además, se sostiene que la utilización de una sola papeleta para las tres (3) proposiciones, con un solo color, es parte de un esquema de confusión y coacción que lesiona el ejercicio del derecho al voto.

El P.I.P. también argumentó que la Ley Habilitadora viola el derecho a la libertad de expresión de los Comisionados al obligarlos a implantar una campaña informativa oficialista a favor de las enmiendas propuestas.

Por su parte, Báez Galib alegó que la Ley Habilitadora no cumple con el requisito constitucional de disponer los términos de vigencia de cada una de las enmiendas.

Por otro lado, Isabel Pérez sostuvo que la referida ley, a diferencia del tratamiento otorgado a los partidos políticos, no provee los mecanismos para hacer posible la participación en el proceso, como observadores, de electores agrupados en organizaciones ni permite su participación en la Comisión Estatal, pero que, al igual que a los partidos, se prohíbe la asignación de fondos públicos a estas agrupaciones.

Finalmente, Isabel Pérez alegó que la propuesta enmienda sobre el Tribunal Supremo es contraria a la Sec. 3

del Art. VI de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, disposición que prohíbe que mediante enmienda se altere la forma republicana de gobierno, ello en vista de que las Ramas Legislativa y Ejecutiva no consultaron al Poder Judicial respecto a dicha proposición de enmienda.

El Tribunal Superior consolidó todas las demandas y recibió los memorandos de derecho de las partes. También atendió, mediante una vista celebrada el 15 de agosto de 1994, los argumentos de las partes en cuanto a la aplicación del Art. 8.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3351,[2] al referéndum de 6 de noviembre de 1994. En cuanto a esto último, el foro de instancia concluyó en su Resolución de 17 de agosto de 1994 que el referido Art. 8.001 tiene plena vigencia en lo referente al referéndum. Como consecuencia, dicho foro ordenó a la Comisión Estatal que nombrara la Junta de Anuncios para que ésta pudiera evaluar la procedencia de la publicación de todos los anuncios gubernamentales durante el período previo al referéndum.

El E.L.A. y la Compañía de Turismo acudieron ante nos en revisión, solicitando la revocación de la referida resolución y orden. Mediante opinión *per curiam* emitida el 8 de septiembre de 1994, confirmamos el dictamen recurrido.[3]

Posteriormente, el Tribunal Superior dictó una senten-

---

[2] Este artículo dispone lo siguiente:

"Se prohíbe a las agencias del Gobierno de Puerto Rico, la Asamblea Legislativa de Puerto Rico y a la Rama Judicial, que a partir del 1ro. de enero del año en que deba celebrarse una elección general y hasta el día siguiente a la fecha de la celebración de la misma, incurran en gastos para la compra de tiempo y espacio en los medios de difusión pública con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes. Se exceptúan de esta disposición aquellos avisos y anuncios de prensa expresamente requeridos por ley.

"Asimismo, se exceptúan de la anterior disposición aquellos anuncios que sean utilizados para difundir información de interés público, urgencia o emergencia, los cuáles sólo serán permitidos previa autorización al efecto de la Comisión Estatal de Elecciones." 16 L.P.R.A. sec. 3351.

[3] El Juez Asociado Señor Negrón García concurrió y disintió por los fundamentos expuestos en su opinión disidente emitida el 2 de septiembre de 1994; el Juez Asociado Señor Rebollo López disintió con opinión escrita, y el Juez Asociado Señor Hernández Denton emitió un voto particular de conformidad.

cia mediante la cual declaró sin lugar todas las demandas presentadas. Conforme determinó el tribunal, las resoluciones concurrentes aprobadas, así como la Ley Habilitadora, son válidas en derecho y no contienen defecto constitucional alguno que amerite la suspensión del referéndum.

Por su inconformidad con la sentencia del Tribunal Superior y por considerar que el asunto trataba sobre una cuestión constitucional sustancial, presentaron sendos escritos de apelación el P.I.P., el P.P.D. e Isabel Pérez Pérez; Báez Galib compareció mediante un recurso de *certiorari*. En apelación, los peticionarios presentaron básicamente los mismos argumentos que esbozaron ante el foro de instancia.([4])

El P.I.P. también presentó una Moción en Auxilio de Jurisdicción solicitando que se le ordenase a la Comisión Estatal paralizar la erogación adicional de fondos, que se dispensara de los trámites usuales de apelación y que se redujeran los términos para la presentación de los alegatos.

El 16 de septiembre de 1994 dictamos una resolución([5]) mediante la cual declaramos sin lugar la Moción en Auxilio de Jurisdicción presentada por el P.I.P por no haberse perfeccionado la apelación al no haberse justificado adecuadamente el ejercicio de nuestra jurisdicción apelativa, conforme a los criterios de la jurisprudencia citada en la resolución.([6])

En lo que respecta a la Petición de *certiorari* de Báez Galib y Movilización Civil, el 19 de septiembre de 1994

---

([4]) El Partido Independentista Puertorriqueño alegó, además, que la asignación de fondos de transportación de electores a los partidos políticos a base de sus ideas y del contenido de su expresión viola la igual protección de las leyes. También señaló que el uso de fondos públicos para financiar el referéndum viola la Sec. 9 del Art. VI de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, sobre el uso de fondos públicos para fines públicos legítimos.

([5]) Dictada por la Sala Especial de Verano compuesta por su Juez Presidente, Señor Negrón García, y los Jueces Asociados Señor Hernández Denton y Señor Alonso Alonso.

([6]) *Calderón, Rosa-Silva & Vargas v. García*, 120 D.P.R. 803 (1988), y *Frente Unido Independentista v. C.E.E.*, 126 D.P.R. 309 (1990).

dictamos una resolución para conceder a las partes hasta el 22 de septiembre para comparecer y presentar sus respectivas posiciones. Oportunamente, tanto el P.I.P. como el P.P.D. perfeccionaron sus respectivas apelaciones.

El 22 de septiembre de 1994 dictamos dos (2) resoluciones. En la primera de éstas, consolidamos los recursos sometidos por el P.I.P. (AC-94-644) y el P.P.D. (AC-94-653) con el recurso sometido por Báez Galib (CE-94-645), y los acogimos como apelación por plantear una cuestión constitucional sustancial.[7] Acordamos, además, darles a estos casos una atención prioritaria. En nuestra segunda resolución, en auxilio de nuestra jurisdicción, le ordenamos a la Comisión Estatal que paralizara toda erogación adicional de fondos y la impresión de las papeletas o cualquier otro material impreso relacionado con el referéndum.[8]

Fundamentalmente, los apelantes plantean tres (3) asuntos medulares, relativos al número de proposiciones de enmienda que se presentarán al pueblo, a la asignación de fondos a la Comisión Estatal para realizar las labores encomendadas por la Ley Habilitadora y a las restricciones impuestas a las contribuciones económicas que podrán recibir las personas o grupos en campaña relacionada con el referéndum.[9]

Con el beneficio de las comparecencias de todas las partes, emprendemos la delicada, difícil e ineludible tarea de adjudicar y resolver estos casos de tanta importancia pública.

---

[7] El escrito de apelación de Isabel Pérez Pérez no se perfeccionó.

[8] El Juez Asociado Señor Negrón García emitió un voto concurrente; el Juez Asociado Señor Rebollo López y la Juez Asociada Señora Naveira de Rodón disintieron sin opinión escrita.

[9] En cuanto a los demás señalamientos de error de los apelantes, consideramos, luego de estudiar los argumentos presentados, que éstos son inmeritorios. La Comisión Estatal de Elecciones se asegurará de garantizar, mediante las medidas que estime necesarias, el derecho al voto de todo elector que no sepa leer y escribir. Art. VI, Sec. 4, Cont. E.L.A., L.P.R.A., Tomo 1.

## II

> ... [E]s fundamental que el pueblo mismo está obligado por su propia Constitución .... Cuando [el pueblo] ha provisto en la misma un método para enmendarla, debe cumplir con ese procedimiento. Cualquier otro curso de acción sería revolucionario. ... (Traducción nuestra y énfasis suprimido.) *Moore v. Brown*, 165 S.W.2d 657, 659 (1942).

■ Lo anterior plasma la continua lucha que existe entre la soberanía popular y la supremacía constitucional. Por un lado, es un principio rector que en toda organización constitucional democrática el punto de partida es la soberanía popular. Corresponde al pueblo inicialmente el poder constituyente, esto es, el de aprobar la constitución como el complejo normativo en el que se regulan todas las competencias del Estado y se enumeran las garantías y libertades de los ciudadanos. Una vez se aprueba la Constitución, ésta se convierte en Ley Suprema que regula una realidad en un devenir permanente:

> Aprobada la Constitución por el pueblo, todos los poderes del Estado pasan a ser poderes constituidos, y el poder constituyente desaparece, para que la normativa fundamental se convierta en el centro de referencia básico del sistema. La Constitución se presenta entonces como ley suprema que, en sustitución del poder soberano del pueblo, aletargado y silencioso, ejercita, como dirían Kelsen y Krabbe, una auténtica soberanía de la Ley y del Derecho.
>
> Planteadas las cosas de este modo, el problema a resolver no es otro que el de cómo compaginar el dogma indiscutible de la soberanía popular con esa otra emergente soberanía de la Constitución y del Derecho, conectada directamente con el entendimiento de la Constitución como ley suprema. P. De Vega, *La Reforma Constitucional*, Madrid, Ed. Tecnos, 1985, pág. 222.

■ Ahora bien, la supremacía constitucional no implica que el pueblo no pueda revisar su *lex superior*. Sin embargo, este poder debe ejercerse de forma que el ordenamiento constitucional pueda mantener su coherencia, libre de los caprichos momentáneos y arbitrarios de las

mayorías. Por tal razón, es necesario que una Constitución tenga un procedimiento específico que limite el proceso mediante el cual se revisa; la naturaleza de este procedimiento debe distinguir la Constitución de las leyes ordinarias. Aunque su grado de rigidez depende de la determinación inicial del poder constituyente, de ordinario, el procedimiento de cambio requiere que se convoque una convención constituyente o se sometan las enmiendas propuestas al electorado en un referéndum. Es por esas características particulares que se considera a una Constitución como *lex superior.* De Vega, *op. cit.*, pág. 238.

◾ Los límites necesarios al proceso de revisión de una Constitución pueden ser explícitos o implícitos. Los primeros constan expresamente en la Constitución; los implícitos son aquellos "cuya existencia sólo puede ser deducida indirectamente, bien como una consecuencia lógica de los presupuestos en que descansa el sistema constitucional considerado en su conjunto, bien como correlato de las singulares cualificaciones que se producen en determinados preceptos de la Constitución". De Vega, *op. cit.*, pág. 242. Con estos límites, el pueblo, lejos de renunciar a su soberanía, asegura unos supuestos ideológicos y valorativos en los que descansa su régimen político. De Vega, *op. cit.*, pág. 248.

> Sólo cuando el pueblo tiene institucionalizados procedimientos para expresar su voluntad, y sólo cuando esa voluntad puede manifestarse espontánea y libremente, adquiere la plenitud de su sentido hablar del principio democrático de soberanía popular. De Vega, *op. cit.*, pág. 290.

De ahí la importancia de respetar los procedimientos ordenados por el pueblo en el ejercicio de su poder constituyente para revisar la Constitución.

◾ Estos procedimientos, además de proteger la voluntad de la soberanía popular, permiten que la Constitución goce de la necesaria estabilidad sin perder la flexibili-

dad indispensable para responder a los cambios en una sociedad dinámica.

En una democracia, la fuerza de una constitución depende de dos factores: *a)* del grado hasta dónde sus disposiciones sean materia de acuerdo general al tiempo de su adopción, y *b)* del grado en que puede ser modificada más tarde, según ocurran cambios en los asuntos en que la sociedad está generalmente de acuerdo. *La Nueva Constitución de Puerto Rico,* Río Piedras, Ed. U.P.R., 1954, Parte II, pág. 519.

■ Ante lo anterior, es necesario que el procedimiento de enmienda garantice que las enmiendas estén realmente respaldadas por el consenso general y que éstas surjan de una consideración cuidadosa e informada por todos los electores. Este principio medular del constitucionalismo moderno fue expresamente considerado por nuestra Convención Constituyente.

La enmienda constitucional presupone, primeramente, que se usen procedimientos especiales para garantizar que dicha enmienda está en efecto respaldada por el consenso que en realidad representa la aquiescencia general al cambio propuesto. En segundo término, como envuelve una alteración de fundamentos, presupone una consideración más cuidadosa y deliberada que la que necesita dársele a los cambios en la ley ordinaria.

. . . . . . . . .

El propósito principal del referéndum es, por supuesto, determinar si el cambio propuesto a la ley fundamental tiene o no el respaldo del electorado. Si la cláusula constitucional sobre el referéndum está bien redactada, tendrá disposiciones para la consecución del objetivo a través de dos medios: uno, estableciendo condiciones que permitan al pueblo familiarizarse con las disposiciones de la enmienda propuesta, y, de este modo, votar con conocimiento de causa; y el otro, estableciendo condiciones por cuya virtud la votación total refleje, con la mayor exactitud posible, la actitud del electorado hacia la proposición. *La Nueva Constitución de Puerto Rico, op. cit.,* págs. 521–532.

■ Por estas razones, los padres de nuestra Constitución diseñaron un procedimiento de enmienda que: (1) requiere la aprobación de por lo menos dos terceras (2/3) partes de los miembros de cada cámara legislativa; (2)

exige que la enmienda sea sometida al electorado en referéndum especial o en una elección general si lo aprueban por lo menos tres cuartas (3/4) partes del número total de los miembros de cada cámara; (3) dispone que cada proposición de enmienda deberá votarse separadamente; (4) limita el número de proposiciones de enmienda a tres (3) en un mismo referéndum; (5) establece que toda enmienda contendrá sus términos de vigencia; (6) requiere el voto afirmativo de la mayoría de los electores que voten sobre el particular, y (7) exige que la proposición de enmienda sea publicada por lo menos noventa (90) días antes del referéndum:)

> La Asamblea Legislativa podrá proponer enmiendas a esta Constitución mediante resolución concurrente que se apruebe por no menos de dos terceras partes del número total de los miembros de que se compone cada cámara. Toda proposición de enmienda se someterá a los electores capacitados en referéndum especial, pero la Asamblea Legislativa podrá, siempre que la resolución concurrente se apruebe por no menos de tres cuartas partes del número total de los miembros de que se compone cada cámara, disponer que el referéndum se celebre al mismo tiempo que la elección general siguiente. Cada proposición de enmienda deberá votarse separadamente y en ningún caso se podrá someter más de tres proposiciones de enmienda en un mismo referéndum. Toda enmienda contendrá sus propios términos de vigencia y formará parte de esta Constitución si es ratificada por el voto de la mayoría de los electores que voten sobre el particular. Aprobada una proposición de enmienda, deberá publicarse con tres meses de antelación, por lo menos, a la fecha del referéndum. Art. VII, Sec. 1, Const. E.L.A., *supra*, ed. 1982, pág. 380.

Nótese que los requisitos de publicidad y separación, y el límite al número de propuestas fueron recomendados expresamente como los mecanismos adecuados para obtener un voto informado del electorado.

> Para que los ciudadanos voten con conocimiento de causa, no se les debe sobrecargar sometiéndoles varias enmiendas a la vez. Es importante, por lo tanto, que se imponga alguna clase de límite al número de enmiendas que puede someterse al

electorado. Algunos estados fijan un límite de tres enmiendas para una determinada elección, y la constitución del estado de Kentucky no permite que se consideren más de dos enmiendas en una misma votación. Veintiocho estados indican lo siguiente en sus constituciones: si dos o más *proposiciones de enmienda* se presentan a ratificación deben votarse independientemente una de otra. El estado de Missouri va aún más lejos al requerir que las proposiciones de enmienda se sometan en papeletas separadas y sin insignias de partido de clase alguna. *La Nueva Constitución de Puerto Rico, op. cit.*, págs. 532—533.

▆▆ En nuestro ordenamiento corresponde a los tribunales evaluar si se cumplieron los requisitos procesales dispuestos por la Constitución para enmendarla. Al analizar las controversias planteadas ante nos, debemos tener presentes los objetivos y principios que modelaron el procedimiento de enmienda de nuestra Constitución. Lo hacemos, además, con plena consciencia de que nuestra labor se circunscribe únicamente a juzgar la constitucionalidad de la Ley Habilitadora y las resoluciones concurrentes que contienen los textos específicos de los cambios propuestos. Véase *State v. City of Baton Rouge*, 215 La. 315, 40 So.2d 477 (1949).

## III

Los recurrentes señalan que la Ley Habilitadora presenta más de tres (3) proposiciones en violación del requisito constitucional de separación. Las apelaciones requieren que por primera vez interpretemos el significado de la cláusula de "proposición de enmienda" para determinar si el estatuto cumple con los requisitos de la Sec. 1 del Art. VII de nuestra Constitución, *supra.* Examinemos en detalle todas las enmiendas propuestas.

La primera proposición enmendaría el párrafo quinto de la Sec. 11 del Art. II de la Constitución, *supra*, para que lea como sigue:

Todo acusado tendrá derecho a permanecer en libertad bajo fianza antes de mediar un fallo condenatorio, excepto cuando

haya sido previamente convicto por delito grave, se le impute la comisión de uno o más delitos graves serios y represente amenaza para la comunidad. Art. 3 de la Ley Núm. 49, *supra*, 1994 (Parte 1) Leyes de Puerto Rico 209.

Por su parte, la segunda proposición enmendaría la Sec. 3 del Art. V de la Constitución, *supra*, para que disponga:

... El Tribunal Supremo será el tribunal de última instancia en Puerto Rico y se compondrá de un Juez Presidente y ocho Jueces Asociados. Leyes de Puerto Rico, *supra*, pág. 209.

Se eliminaría la potestad del Tribunal Supremo para solicitar un aumento o una disminución en el número de sus Jueces. En cuanto a esta enmienda, los recurrentes señalan que contiene dos (2) proposiciones. Sostienen que no solamente se fija el número de Jueces en nueve (9), sino que también deroga la facultad de esta Curia de solicitar a la Asamblea Legislativa que se varíe el número de sus miembros.

Por último, se añade una Sec. 20 al Art. VI de la Constitución, *supra*, para disponer:

... Ninguna persona podrá ser electa en elección general al cargo de Gobernador por más de dos términos, ni a los cargos de Senador, Representante o Alcalde por más de tres términos. Leyes de Puerto Rico, *supra*, pág. 209.

De acuerdo con lo señalado por los recurrentes, esta enmienda se desglosa en tres (3) proposiciones, una por cada cargo al cual se limita los términos de reelección.[10] De refrendar esta teoría, serían seis (6) las proposiciones presentadas al Pueblo de Puerto Rico en el próximo referéndum.[11]

---

[10] Los apelantes no han argumentado que los cargos de Senador y Representante deban verse como dos (2) puestos separados, por lo que no es necesario pasar juicio sobre este asunto.

[11] Los apelantes también exponen que la inclusión del cargo de Alcalde en la propuesta enmienda crearía dicho puesto con rango constitucional, lo cual constituiría otra enmienda separada. Por el resultado al cual llegamos, no es necesario evaluar este argumento.

Nuestra Constitución estableció un límite explícito a la facultad del pueblo y de sus representantes para enmendarla, al especificar que sólo se podría votar por tres (3) proposiciones de enmienda a la vez y que cada una tendría que someterse a votación por separado. Surge claramente del Diario de Sesiones de la Convención Constituyente y de *La Nueva Constitución de Puerto Rico* que estos requisitos se adoptaron siguiendo el ejemplo de las Constituciones de varios estados de Estados Unidos de América, con el entendido de que eran indispensables para lograr el voto consciente y libre del pueblo en relación con la enmienda constitucional.

■ En estas circunstancias, en buena metodología adjudicativa, procede que examinemos la experiencia de algunos estados, recordando siempre que la jurisprudencia aplicable no es obligatoria y conscientes de que nos corresponde interpretar nuestra Constitución conforme a nuestra particular realidad de pueblo. Veamos.

En términos generales, la inclusión en Constituciones estatales de cláusulas de separación y límites al número de proposiciones de enmienda pretende evitar que los electores sean engañados o confundidos al tener que votar unitariamente por proposiciones tan distintas e independientes entre sí que no tienen relación alguna a una materia en general. Se protegió además al electorado contra la práctica de *logrolling*, esto es, la de unir materias no aceptadas a otras que sí son deseadas para obligar al electorado a aceptar lo que de otra forma rechazaría. El propósito de este tipo de cláusula es garantizar que cada proposición sea admitida o rechazada por el pueblo sobre la base de sus propios méritos:

> The primary objection to amendments with more than one subject is that the voters must approve or disapprove the entire measure as a whole, rather than vote separately for or against each subject. *Farris v. Munro*, 662 P.2d 821, 825 (Wash. 1983).

Véanse, también: *Keenan v. Price*, 195 P.2d 662 (1948); *State v. Wetz*, 168 N.W. 835 (1918); *McBee v. Brady*, 100 P. 97 (1909).[12]

Por otro lado, los límites al número de enmiendas también se consideraron como medidas necesarias para evitar que se realizaran, a través del procedimiento de enmienda, revisiones totales a las constituciones sin cumplir con el procedimiento de elegir una convención constituyente. D.H. Lowestein, *California Initiatives and the Single-Subject Rule*, 30 UCLA L. Rev. 936 (1983).

Con estos objetivos en mente, tan temprano como en 1882 los tribunales supremos estatales tuvieron que darse a la tarea de decidir si una enmienda consistía en una o más proposiciones. En *State v. Timme*, 11 N.W. 785 (1882), se formularon por primera vez unos criterios para decidir este tipo de controversia, al concluir que debían presentarse por separado aquellas enmiendas que tuvieran diferentes propósitos y objetivos.

> In order to constitute more than one amendment, the propositions submitted must relate to more than one subject, and have at least two distinct and separate purposes not dependent upon or connected with each other. *State v. Zimmerman*, 60 N.W.2d 416, 421 (1953), citando a *State v. Timme*, supra. Véase, también, *Funk v. Fielder*, 243 S.W.2d 474 (1951).

Se estableció como criterio rector la singularidad del propósito de la enmienda, de forma que se pudiesen unir las proposiciones incidentales necesarias para promover ese objetivo único.

> The singleness of purpose or object sought to be accomplished by the amendment is the test as to whether it complies with such section.

---

[12] Los dos (2) propósitos de esta disposición constitucional se han resumido como sigue: "to prevent imposition upon or deceit of the public by the presentation of a proposal which is misleading or the effect of which is concealed or not readily understandable" y "to afford the voters freedom of choice and prevent 'logrolling', or the combining of unrelated proposals in order to secure approval by appealing to different groups which will support the entire proposal in order to secure some part of it although perhaps disapproving of other parts." *Fugina v. Donovan*, 104 N.W.2d 911, 914 (1960).

> Thus, where an amendment to the Constitution relates to a single purpose or object and all else contained therein is incidental and reasonably necessary to effectuate the purpose of the amendment, such amendment is not violative of the provisions of [separability and limits on the number of amendments]. *State v. Greater Portsmouth Growth Corp.*, 218 N.E.2d 446 (1966).

■ No obstante, la jurisprudencia estatal también ha reconocido que una sola enmienda no deja de serlo por el solo hecho de que afecte más de una sección o artículo de la Constitución. Tampoco deja de serlo por el hecho de que sea susceptible de subdivisión en partes, siempre que éstas sean de tal naturaleza que deban ser favorecidas o rechazadas como un todo para evitar que se afecte la coherencia de la Constitución. Véanse, por ejemplo: *Coalition for Political Honesty v. State Bd.*, 415 N.E.2d 368 (1981); *Keenan v. Price*, supra.([13])

Muchas han sido las formas de expresar el significado de la cláusula de una sola proposición de enmienda, pero la mejor formulación de los criterios aplicables a situaciones como las del caso de autos fue expuesta en *Kerby v. Luhrs*, 36 P.2d 549, 554 (1934), donde se expresó:

> If the different changes contained in the proposed amendment all cover matters necessary to be dealt with in some manner, in order that the Constitution, as amended, shall constitute a consistent and workable whole on the general topic embraced in that part which is amended, and, if logically speaking, they should stand or fall as a whole, then there is but one amendment submitted. But, if any one of the propositions, although not directly contradicting the others, does not refer to such matters, or if it is not such that the voter supporting it would reasonably be expected to support the principle of the others, then there are in reality two or more amendments to be submitted, and the proposed amendment falls within the constitutional prohibition. ... Changes suggested thereto should re-

---

([13]) En *Idaho Water Resource Board v. Kramer*, 548 P.2d 35, 50 (Idaho 1976), se redujo la controversia a la pregunta siguiente: *"can the change or changes proposed be divided into subjects distinct and independent, and can any one of which be adopted without in any way being controlled, modified or qualified by the other?"* (Énfasis suplido.) Citando a *McBee v. Brady*, 100 P. 97, 103 (1909).

present the free and mature judgment of the electors, so submitted that they cannot be constrained to adopt measures of which in reality they disapprove, in order to secure enactment of others they earnestly desire.

De acuerdo con lo anterior, se trata de una sola proposición si el texto contiene los detalles necesarios para lograr un "propósito único", de forma que para lograr ese objetivo sea indispensable que todos sean aprobados o rechazados a la vez. Si no existe esta interdependencia o si los cambios no son de tal naturaleza que se pueda esperar razonablemente que un elector desee votar uniformemente en cuanto a todos ellos, se trata en realidad de más de una enmienda. De esta manera se evita la confusión entre los electores y se asegura que los cambios en la Constitución representen la voluntad libre e informada del electorado.

Sin embargo, si bien los estados han expuesto consistentemente el mismo criterio al evaluar casos como el de autos, su aplicación y los resultados correspondientes han sido muy variados, pues cada caso es y debe ser evaluado a la luz de la naturaleza particular de las proposiciones bajo consideración.

Por lo tanto, será necesario evaluar cada enmienda tomando en consideración que la definición del concepto "propósito" no puede ser tan abarcadora como para incluir en su ámbito cualquier combinación de proposiciones como una sola enmienda. Tampoco puede ser tan rígida como para hacer imposible enmendar la Constitución. Lowestein, *supra*, pág. 942.

En el caso de las enmiendas a la Constitución del Estado Libre Asociado de Puerto Rico, nuestro análisis debe guiarse por el propósito fundamental que pretendieron alcanzar los padres de nuestra Constitución al diseñar el procedimiento de enmienda: asegurar la estabilidad de nuestra Ley Suprema y permitir que ésta tenga suficiente flexibilidad para responder a los cambios de la sociedad puertorriqueña. Examinada la normativa aplicable, procede analizar cada una de las enmiendas.

## IV

Los apelados sostienen que existe un propósito único por el cual la limitación de los términos a los tres (3) cargos públicos deben presentarse al pueblo como una sola proposición de enmienda: evitar el continuismo político. Sin embargo, un examen cuidadoso del asunto revela que esta proposición contiene más de un propósito.

Es necesario recordar que la jurisprudencia norteamericana consistentemente ha evaluado si las partes de una enmienda están conectadas y son dependientes entre sí para determinar si existe la unidad de propósito requerida.

El Art. III, Sec. 1 de nuestra Constitución, L.P.R.A., Tomo 1, establece que el Poder Legislativo se ejercerá por una Asamblea Legislativa compuesta por el Senado y la Cámara de Representantes. Añade que "[sus] miembros serán elegidos por votación directa en cada elección general". Íd., ed. 1982, pág. 334. El Art. III de la Constitución del Estado Libre Asociado, *supra*, dispone también los requisitos de edad y residencia que han de cumplirse para poder ocupar los cargos mencionados. La enmienda propuesta tendría el efecto de modificar indirectamente este artículo, por cuanto añade un requisito adicional: el no haber sido legislador por más de tres (3) términos.

Por su parte, el Art. IV de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, regula lo concerniente al Poder Ejecutivo, que es ejercido por un gobernador, también electo por el voto directo del pueblo. Art. IV, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1. El referido artículo también especifica los requisitos para ocupar el cargo de Gobernador así como sus facultades y deberes, entre otros. La enmienda propuesta tendría el efecto de añadir, indirectamente, un requisito para poder ocupar el cargo: no haber sido electo Gobernador por más de dos (2) términos.

Tratándose de cargos electivos diferentes e independientes, no es necesario limitar los términos de los tres (3) car-

gos en una sola proposición de enmienda para conservar la coherencia y consistencia de la Constitución. Por ejemplo, razonablemente se podría limitar sólo los términos del Gobernador sin afectar los cargos de Legislador y Alcalde. Cada limitación de términos de cada cargo tendría por sí sola pleno efecto y vigencia por separado *sin requerirse para ello la aprobación de las limitaciones en cuanto a los otros dos (2) cargos políticos.* Ninguna es incidental a la otra ni puede considerarse como un detalle necesario para lograr un plan general. Más bien, se trata de enmiendas totalmente independientes entre sí, que han sido hilvanadas artificial y superficialmente, y no satisfacen los criterios constitucionales de unidad de propósito.

Más aún, es razonable pensar, como bien reconoció el tribunal de instancia, que un elector puertorriqueño podría favorecer la limitación de los términos en cuanto a uno (1) o dos (2) de los cargos y no en cuanto a todos. Se trata de unos cargos de diferente naturaleza y función. El Gobernador dirige la Rama Ejecutiva con la obligación de velar por el cumplimiento de las leyes y de dirigir en términos generales el destino de Puerto Rico. Los legisladores componen la Rama Legislativa y cumplen la importante función de promulgar las leyes que rigen a nuestro país. Para ello fungen tempereramente como representantes del Pueblo de Puerto Rico.

Finalmente, los alcaldes dirigen los municipios, criaturas de la Asamblea Legislativa, y tienen un contacto más directo con el diario vivir de la comunidad. Su responsabilidad es satisfacer las necesidades cotidianas de los vecinos del municipio a su cargo.

Se trata evidentemente de responsabilidades y funciones muy diferentes, especialmente en cuanto al contacto y a la relación que tienen con el pueblo. No se puede ignorar la innegable realidad de que al unir en una sola enmienda la limitación de los términos de estos cargos, se está obligando al pueblo puertorriqueño a favorecer unas proposi-

ciones que *razonablemente podría rechazar para lograr la aprobación de otras que favorece.* Precisamente esto es lo que los padres de nuestra Constitución quisieron evitar al aprobar la Sec. 1 del Art. VII, *supra.*

Por ende, es menester concluir que la Ley Habilitadora, en cuanto ordena someter a votación la limitación de los términos de los cargos de Gobernador, Legislador y Alcalde, es inconstitucional por violar el requisito de separación al presentar tres (3) proposiciones de enmienda como una sola. Además, la Ley Habilitadora, al someter estas tres (3) proposiciones junto a las de limitación al derecho a la fianza y fijación del número de Jueces, presenta ante la consideración del pueblo un número de enmiendas en exceso de las permitidas por nuestra Constitución.

Resuelto lo anterior, evaluemos si la propuesta de enmienda sobre el número de Jueces adolece del mismo defecto constitucional.

## V

La Resolución Concurrente del Senado Núm. 44, *supra,* establece que el propósito de la enmienda es fijar el número de Jueces que compondrá este Tribunal. El propósito de la enmienda, según lo expresó la Asamblea Legislativa, es dar estabilidad y continuidad a este Foro judicial. Para ello, se propone enmendar la Sec. 3 del Art. V de la Constitución del Estado Libre Asociado, *supra*, en dos (2) dimensiones: estableciendo que este Tribunal se compondrá de nueve (9) Jueces, y segundo, eliminando la facultad exclusiva de este Tribunal de iniciar el proceso de modificación al número de sus integrantes. Aquí es notoria la interdependencia de los dos (2) cambios.

Según está redactada actualmente esta sección de nuestra Constitución, el Tribunal Supremo se compone de cinco (5) Jueces, pero tiene la facultad exclusiva de solicitar que, mediante legislación, se cambie el número de sus

miembros. En ausencia de dicho pedido, no es posible alterar el número de Jueces que compone este Tribunal. Hemos ejercido en el pasado esta facultad con mucha prudencia, respondiendo únicamente al propósito de cumplir responsablemente con nuestras obligaciones constitucionales, y actualmente este Tribunal se compone de seis (6) Jueces Asociados y un Juez Presidente. Es innegable que si lo que se pretende es *fijar* permanentemente en nueve (9) el número de Jueces de este Tribunal, se requiere como elemento indispensable e incidental para lograr este propósito eliminar la facultad de la Asamblea Legislativa y del Gobernador de, a iniciativa de este Tribunal, cambiar dicho número.

Nótese que si se votara por separado en cuanto a estos dos (2) temas, existiría la posibilidad de llegar al resultado de establecer un Tribunal compuesto por nueve (9) Jueces, pero que se conserve el mecanismo de cambio actual, lo cual resultaría incongruente si se evalúa a la luz del propósito de fijar permanentemente su composición. También sería posible que, como resultado de una votación separada, quedara establecido un Tribunal compuesto permanentemente por cinco (5) Jueces, resultado que sería aún más incompatible con el propósito perseguido por la enmienda propuesta.

■ Por ende, resolvemos que la proposición de enmienda al número de Jueces que compone este Tribunal cumple con los requisitos de la Sec. 1 del Art. VII, *supra*, y puede ser sometida a la consideración del Pueblo de Puerto Rico para su aprobación o rechazo en el referéndum de 6 de noviembre.

## VI

Nuestra anterior determinación de que la enmienda propuesta sobre el número de términos de ciertos cargos electivos, en su forma actual, no cumple con los citados

requisitos de rango constitucional, no impide la celebración del referéndum el próximo 6 de noviembre. En el pasado establecimos que la fórmula para decidir si un estatuto con defectos constitucionales es total o parcialmente nulo se divide en dos (2) fases. Primero, es necesario determinar si la ley es susceptible de mantenerse en vigor una vez se eliminan las cláusulas inconstitucionales. Segundo, se debe evaluar si la Legislatura hubiera aprobado la ley sin tales disposiciones. Este análisis debe tomar en cuenta que cuando existe una cláusula de separabilidad, se presume que, si los tribunales declaran una parte de una ley inconstitucional, la Asamblea Legislativa interesa que el resto del estatuto se mantenga en vigor. Véase *Tugwell, Gobernador v. Corte*, 64 D.P.R. 220, 226–230 (1944).

En el presente caso, en su Art. 27 (16 L.P.R.A. sec. 956 n.) la Ley Habilitadora establece que "[s]i cualquier parte, *inciso* o artículo de esta ley fuera declarada inconstitucional por tribunal competente, la sentencia a tal efecto dictada se limitará a la parte, *inciso* o artículo declarado inconstitucional, y no afectará ni invalidará el resto de las disposiciones de esta ley". (Énfasis suplido.) De este texto claramente se desprende que el estatuto debe mantenerse en vigor aun después de eliminados los incisos relacionados con la proposición de enmienda para añadir la Sec. 20 al Art. VI de la Constitución, *supra*. Nada indica que se debe ignorar este mandato legislativo en el caso de autos.

Por ende, concluimos que procede eliminar de la Ley Habilitadora los incisos relacionados con la proposición de enmienda sobre los términos de los cargos electivos y mantener en vigor el resto de la ley con las dos (2) enmiendas propuestas referentes a la fianza y a la composición de este Tribunal.

# VII

Los apelantes también impugnan como insuficientes las actuaciones de la Comisión Estatal en el cumplimiento de las disposiciones de la Ley Habilitadora asignándoles fondos para realizar una campaña de información y orientación sobre el contenido de las enmiendas. Además, cuestionan los límites impuestos a toda persona respecto a las contribuciones que pueden hacer para beneficio de entidades que estén haciendo campaña a favor o en contra de alguna de las enmiendas propuestas.

Sostienen que la Comisión Estatal se ha limitado a publicar el texto de las enmiendas propuestas y de los segmentos de la Constitución que quedarían modificados o eliminados. Se señala que la Comisión Estatal, al circunscribirse a la actuación mencionada, no ha cumplido con el Art. 7 de la Ley Habilitadora, *supra*, y que su interpretación viola la letra y el espíritu de la Ley Habilitadora. Según los apelantes, este mandato legislativo obliga a la Comisión Estatal a llevar a cabo una campaña mucho más amplia de la que hasta ahora se ha llevado a cabo, la cual oriente adecuadamente al electorado sobre el significado de las enmiendas propuestas así como sobre las razones para votar a favor y en contra de dichas enmiendas.

Es por esta razón que uno de los apelantes solicitó que, en auxilio de nuestra jurisdicción, paralizáramos el desembolso de fondos por la Comisión Estatal en relación con la campaña que estaba llevándose a cabo. La parte apelante expuso que, de no detenerse este desembolso, una decisión posterior que ampliara el ámbito de la campaña se hubiera visto afectada, ya que en el entretanto se hubieran reducido sustancialmente los fondos disponibles para instrumentar una verdadera campaña de información y orientación sobre las enmiendas propuestas. Por entender que en torno a este señalamiento el apelante tenía una alta probabilidad de prevalecer en los méritos, decidimos parali-

zar, mediante Resolución emitida el 23 de septiembre de 1994,([14]) "toda erogación adicional de fondos en relación con la campaña de información y orientación dispuesta por el Artículo 7 de la Ley Habilitadora".

Este artículo dispone que la Comisión Estatal

> ... instrumentará una campaña de información y orientación a los electores ... sobre el contenido de las enmiendas a la Constitución .... Como parte de su fase de información y orientación esta campaña reproducirá textualmente en los medios de comunicación el texto de las enmiendas ....
>
> Todos los fondos utilizados en este Capítulo para campañas de información y orientación serán para el uso exclusivo de la Comisión Estatal de Elecciones.([15]) 16 L.P.R.A. sec. 956f.

El *Diccionario de la Lengua Española*, 21ra ed., Madrid, Ed. Espasa-Calpe, 1992, pág. 1053, define el vocablo "orientar", en su acepción pertinente al Art. 7, *supra*, como "[i]nformar a uno de lo que ignora y desea saber, del estado de un asunto o negocio, para que sepa mantenerse en él". Por ende, el mandato evidente del Art. 7 de la Ley

---

([14]) El Juez Asociado Señor Negrón García emitió un voto concurrente. Los Jueces Asociados Señor Rebollo López y Señora Naveira de Rodón disintieron sin opinión escrita.

([15]) El texto completo del Art. 7 (16 L.P.R.A. sec. 956f) es el siguiente:

... La Comisión Estatal de Elecciones instrumentará una campaña de información y orientación a los electores debidamente calificados sobre el contenido de las enmiendas a la Constitución que se someten a votación, la forma en que marcarán su papeleta para consignar en ella su voto, y para exhortar al electorado a que se inscriba y participe en la votación, utilizando para ello todos los medios de comunicación y técnicas de difusión pública a su alcance.

"Dicha campaña debe iniciarse con no menos de noventa (90) días de antelación al referéndum. Como parte de su fase de información y orientación esta campaña reproducirá textualmente en los medios de comunicación el texto de las enmiendas a la Constitución. La Comisión Estatal de Elecciones además publicará por lo menos una vez en todos los periódicos de circulación general el texto íntegro de las enmiendas, según determinadas y acordadas por la Duodécima Asamblea Legislativa mediante la Resolución Concurrente de la Cámara Núm. 32, la Resolución Concurrente del Senado Núm. 44 y el Sustitutivo a la Resolución Concurrente de la Cámara Núm. 14, y reproducirá dicho texto en hojas sueltas a ser distribuidas masivamente. Copias de las enmiendas a la Constitución del Estado Libre Asociado de Puerto Rico estarán disponibles el día del referéndum en los colegios electorales para ser entregadas a los electores.

"Todos los fondos utilizados en este Capítulo para campañas de información y orientación serán para el uso exclusivo de la Comisión Estatal de Elecciones."

Habilitadora, *supra*, claramente obliga a la Comisión Estatal a orientar adecuadamente a la ciudadanía, no sólo sobre la forma de votar y sobre el contenido de las enmiendas, sino sobre su significado y las razones para votar a favor y en contra de cada una de ellas.

Con el propósito de orientar al electorado de modo que el resultado de la votación sobre este importante asunto refleje la opinión consciente, inteligente y deliberada del pueblo, procede que interpretemos amplia y liberalmente este artículo para reconocerle autoridad a la Comisión Estatal para realizar una campaña educativa e informativa sobre el proceso de referéndum y las enmiendas que se proponen. Un indicador del alcance amplio que se le pretendió imprimir a esta disposición es el hecho de que la divulgación del texto de las enmiendas solamente se ordenó en la ley "como parte de [la] fase de información y orientación". Más aún, esta amplia interpretación nos lleva a un resultado que coincide con el criterio adoptado en varias jurisdicciones y apoyado en la obra *La Nueva Constitución de Puerto Rico, op. cit.*:

> El propósito principal del referéndum es, por supuesto, determinar si el cambio propuesto a la ley fundamental tiene o no el respaldo del electorado. [Para lograr este objetivo, deben establecerse] condiciones que permitan al pueblo familiarizarse con las disposiciones de la enmienda propuesta, y, de este modo, votar con conocimiento de causa ....
>
> a) *Condiciones que llevan a un voto consciente.* —Cuarenta y dos estados de la Unión norteamericana hacen obligatoria la publicación de información relativa a la enmienda antes del referéndum. Por lo general, se exige que el texto de la enmienda se difunda ampliamente. Massachusetts exige [por virtud de su Constitución] que se envíe a cada elector inscrito una copia de la enmienda en unión de todos los argumentos en favor y en contra de ella. (Énfasis en el original.) y escolios omitidos. *La Nueva Constitución de Puerto Rico, op. cit.*, págs. 531–532.

Por su parte, los estados de Massachusetts y California han adoptado una política pública, reflejada constitucional y estatutariamente, que incorpora de manera detallada los

principios generales que hemos derivado de la Ley Habilitadora. Sobre este tema, la Constitución de Massachusetts dispone lo siguiente:

> The secretary of the commonwealth shall cause to be printed and sent to each person eligible to vote in the commonwealth or to each residence of one or more persons eligible to vote in the commonwealth the full text of every measure to be submitted to the people, together with a copy of the legislative committee's majority and minority reports, if there be such, with the names of the majority and minority members thereon, a statement of the votes of the general court on the measure, and a fair, concise summary of the measure as such summary will appear on the ballot; and shall, in such manner as may be provided by law, cause to be prepared and sent other information and arguments for and against the measure. M.G.L.A. Const. Amend. Art. 48, Gen.Prov., Pt. 4. (Supp. 1994).

Conforme a lo anterior, en dicho estado se han aprobado unos estatutos con el propósito de poner en vigor la sabia política de informar y orientar, de la manera más completa, detallada e imparcial posible, al electorado en relación con la enmienda constitucional propuesta. Dichas leyes exigen que se le envíe a cada elector inscrito una copia de la enmienda propuesta, un resumen de ésta preparado por el Procurador General, una aseveración de una oración preparada por un funcionario estatal la cual describa el efecto de un voto a favor o en contra y, finalmente, argumentos a favor y en contra de la enmienda propuesta. Estos argumentos se obtienen de los principales proponentes y oponentes de la enmienda. M.G.L.A. c. 54, Secs. 53–54.[16]

En California se ha dispuesto por legislación que se deberá preparar un folleto (*ballot pamphlet*) que contendrá, en el caso de enmiendas constitucionales propuestas por la Legislatura para la aprobación del pueblo, argumentos a

---

[16] Sabiamente, la Constitución del estado de Massachusetts también prohíbe que mediante iniciativa popular se propongan unas enmiendas constitucionales relativas a los poderes y la creación o abolición de tribunales. M.G.L.A. Const. Amend. Art. 48, Init., Pt. 2, Sec. 2.

favor y en contra de dicha enmienda, redactados, respectivamente, por el legislador que introdujo la propuesta y por alguno de los legisladores que votó en contra de dicha propuesta. Cal. West's Ann. Elec. Code Secs. 3526–3529 y 3563–3565. El folleto, además, debe incluir el texto de la enmienda propuesta, el texto de la disposición constitucional que sería eliminada o modificada por la enmienda, el total de votos emitidos en cada cámara legislativa a favor y en contra de cada enmienda, un análisis de la medida preparado por un funcionario especial, cualquier material gráfico y de otra índole que haga el folleto más fácil de entender o más útil para el votante promedio, y una notificación de qué copias adicionales del folleto se enviarán por correo de así solicitarse. Cal. West's Ann. Elec. Code Secs. 3569–3571. Estos folletos son enviados a todos los votantes con cierto tiempo de anticipación al referéndum. Cal. West's Ann. Elec. Code Secs. 3578–3579.

Tanto del historial de la Convención Constituyente como de la tradición y experiencia democrática en Estados Unidos y en Puerto Rico, se desprende claramente el postulado básico de que en la votación sobre enmiendas constitucionales existe el deber afirmativo del Estado y de sus organismos de mantener la neutralidad y de propiciar la más amplia divulgación de información y orientación sobre las razones a favor y en contra de los cambios propuestos. A la luz del lenguaje de la Ley Habilitadora, de la experiencia de otras jurisdicciones en relación con la adopción de enmiendas constitucionales y de la importancia para el país de que la expresión popular en torno a las enmiendas propuestas refleje el verdadero sentir del electorado, producto de una decisión informada, consciente e inteligente, resolvemos que el Art. 7 de la Ley Habilitadora, *supra*, obliga a la Comisión Estatal a, como parte de su deber de informar y orientar al pueblo sobre el contenido de las enmiendas propuestas, educar efectivamente a

los votantes sobre el significado de las enmiendas y sobre las razones alegadas a favor y en contra de éstas.

En el cumplimiento de dicha labor se le deberá dar participación plena, directa y efectiva a los Comisionados Electorales en todas las etapas de la campaña, particularmente en su contenido. Además, se deberá usar cualquier otro recurso que la Comisión Estatal estime pertinente y útil para llevar a cabo esta encomienda, incluso auspiciar programas de televisión y radio en los que participen los Comisionados Electorales o sus representantes, explicando sus respectivas posiciones a favor y en contra de cada enmienda. Recordemos que los Comisionados Electorales integran la Comisión Estatal y tienen voz y voto en todas sus deliberaciones. Aunque representan a los partidos políticos, son funcionarios que reciben remuneración de fondos públicos y, como miembros de la Comisión Estatal, son responsables de "planificar, organizar, estructurar, dirigir y supervisar el organismo electoral y todos los procedimientos de naturaleza electoral ...". 16 L.P.R.A. sec. 3013.

La Ley Habilitadora le delegó a la Comisión Estatal, como cuerpo colegiado, la responsabilidad de llevar a cabo una campaña de orientación a los electores sobre las enmiendas propuestas. Como los Comisionados Electorales y los Comisionados Electorales alternos son parte esencial de la Comisión Estatal, ellos deben tener plena participación en el diseño, el contenido, la preparación y el desarrollo de la campaña de orientación requerida por el Art. 7 de la Ley Habilitadora, *supra*. Además, en el cumplimiento de su deber, la Comisión Estatal podrá dar participación, según lo estime conveniente, a las agrupaciones que hayan acreditado su interés en participar en el proceso electoral.

La Comisión Estatal deberá gastar cantidades iguales para la divulgación de las razones a favor y en contra de cada una de las enmiendas propuestas y deberá asegurarse de que los fondos utilizados para el logro de

este objetivo tengan el efecto de informar y orientar objetivamente a la ciudadanía.

 En torno a este mandato, debemos apuntalar que la constitucionalidad de actuaciones del Estado dirigidas a informar a la ciudadanía sobre las opciones que tiene ante sí en un evento electoral como el del presente caso, incluso el exponer las razones para votar a favor y en contra de las distintas iniciativas, ha sido sostenida siempre que esta labor se realice de manera neutral. *Stanson v. Mott*, 551 P.2d 1, 10–13 (Cal. 1976); *Citizens to Protect Pub. Funds v. Board of Education*, 98 A.2d 673 (1953). Lo que el Estado no puede hacer es violar su deber de neutralidad y emprender campaña, directa o indirectamente, en relación con el asunto sometido al pueblo en el evento electoral, ello por virtud de la Primera Enmienda de la Constitución federal y de la Sec. 2 del Art. II de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1. *Stanson*, supra, págs. 9–10; *Mountain States Legal, etc. v. Denver School Dist.*, 459 F. Supp. 357 (D. Colo. 1978); *Stern v. Kramarsky*, 375 N.Y.S.2d 235, 239–240 (1975); E.H. Ziegler, *Government Speech and the Constitution: The Limits of Official Partisanship*, 21 B.C. L. Rev. 578 (1980).[17]

 Naturalmente, en ausencia de otra regla aplicable, la norma expuesta anteriormente no impide que, al amparo de la libertad de expresión que cobija a todos los ciudadanos, cualquier funcionario público, en su carácter personal, se exprese a favor o en contra de una propuesta

---

[17] Reproducimos unas expresiones que sintetizan de manera excelente lo antes expuesto:

"The spectacle of state agencies campaigning for or against propositions or proposed constitutional amendments to be voted on by the public, albeit perhaps well-motivated, can only demean the democratic process.... [State agencies] must maintain a position of neutrality and impartiality.

. . . . . .

"To educate, to inform, to advocate or to promote voting on any issue may be undertaken, provided it is not to persuade nor to convey favoritism, partisanship, partiality, approval or disapproval by a State agency of any issue .... *Stern v. Kramarsky*, 375 N.Y.S.2d 235, 239 (1975).

sometida a un referéndum. El principio de neutralidad sólo los limita cuando se expresan en su capacidad oficial como funcionarios gubernamentales.

Finalmente, en este contexto no es menester discutir la constitucionalidad de las disposiciones del Art. 7, *supra*, y del Art. 8 de la Ley Habilitadora, 16 L.P.R.A. sec. 956g, las cuales proveen para el uso exclusivo por la Comisión Estatal de los fondos para la campaña de información y orientación, y que establecen además que ningún partido político, grupo o individuo recibirá, bajo ningún concepto, fondos públicos de los asignados por la ley en relación con el referéndum.[18] Estas disposiciones de ley son compatibles con la facultad que tiene la Comisión Estatal para dar participación a estas organizaciones con el propósito de que le asistan en el proceso de cumplir con el mandato legislativo de orientar e informar al pueblo sobre el contenido de las enmiendas propuestas.

---

[18] El Art. 8, en su totalidad, dispone lo siguiente:

Los partidos políticos debidamente inscritos podrán participar en el referéndum, siempre que sus organismos directivos centrales informen a la Comisión Estatal de Elecciones de tal intención dentro de los quince (15) días siguientes a la fecha de la vigencia de esta ley. Así también, podrán participar como observadores, cualesquiera agrupaciones bona fide de ciudadanos siempre que cumplan con los requisitos que a estos efectos disponga la Comisión Estatal de Elecciones mediante reglamentación. La Comisión Estatal de Elecciones dispondrá, mediante reglamento, el nivel de participación que estas agrupaciones tendrán en el proceso del referéndum conforme a lo dispuesto en la Ley Electoral. Las agrupaciones ciudadanas que deseen participar deberán informar a la Comisión Estatal de Elecciones de tal intención dentro de los quince (15) días siguientes a la fecha de vigencia de esta ley. Todos los partidos políticos principales que notifiquen a la Comisión Estatal de Elecciones de su intención de participar en el referéndum tendrán el derecho a tener la representación que dispone la Ley Electoral de Puerto Rico en la Comisión Local, Junta de Unidad Electoral y Junta de Colegio. Si dentro del término aquí establecido ningún partido notifica su intención de participar en el referéndum, la Comisión Estatal de Elecciones mediante reglamentación, establecerá un procedimiento para otorgarle a algún grupo cívico o político la representación del 'SI' o 'NO', en los colegios de votación el día del referéndum. La Comisión Estatal de Elecciones establecerá, además, el procedimiento para que el día del referéndum cualquier elector pueda representar en su colegio de votación las alternativas del 'SI' o del 'NO' o a su partido político si éstos no tienen representación en dicho colegio. Ningún partido político, grupo o individuo recibirá fondos de los dispuestos en esta ley para los propósitos de información y orientación a los electores o por cualquier otro concepto. P. de la C. 1463 de 13 de julio de 1994, 12ma Asamblea Legislativa, 4ta Sesión Ordinaria, págs. 9–10.

# VIII

Por último, la Ley Habilitadora, en su Art. 19 (16 L.P.R.A. sec. 956r), restringe las contribuciones que puede hacer una persona a las campañas relacionadas con el referéndum y prohíbe que las instituciones bancarias y otras de naturaleza similar contribuyan dinero alguno a dichas campañas:

> Ninguna persona natural o jurídica podrá en forma directa o indirecta, hacer contribuciones para la campaña del referéndum de un partido político principal, agrupación, organización, entidad o a grupos independientes que esté a favor o en contra de alguna de las tres propuestas para enmendar la Constitución en exceso de las cantidades indicadas a continuación:
>
> (a) Las personas naturales o jurídicas podrán hacer contribuciones voluntarias a un partido político o agrupación que esté a favor o en contra de alguna de las propuestas enmiendas a la Constitución en el referéndum hasta una cantidad de mil (1,000) dólares por cada una de las propuestas de enmiendas a la Constitución, para un máximo de tres mil (3,000) dólares.
>
> (b) Será ilegal toda contribución directa o indirecta de una institución bancaria, de cualquier institución dedicada a prestar dinero; de casas de corretaje dedicadas a la venta de valores; y de corporaciones cuyas acciones se vendan en mercados de valores o al público en general, o de afiliadas o subsidiarias de éstas, hecha para fines de la campaña del referéndum de cualquier partido político o agrupación que represente una de las propuestas enmiendas a la Constitución en el referéndum.
>
> (c) La Comisión Estatal de Elecciones mediante reglamentación al efecto dispondrá lo relativo a los informes contentivos relacionados con la recaudación de fondos. 16 L.P.R.A. sec. 956r.

Los apelantes cuestionan la constitucionalidad de estas restricciones sobre la base de que limitan indebidamente la libertad de expresión de los partidos políticos en la medida en que limitan su capacidad para recaudar dinero para hacer campaña.

Aunque ciertamente se está limitando la capacidad de recoger fondos de los partidos y grupos que desean hacer una campaña en relación con el referéndum, no se trata de

una restricción innecesaria. Más aún, estas restricciones adelantan un interés gubernamental de gran importancia. Desde *P.N.P. v. Tribunal Electoral*, 104 D.P.R. 741, 751 (1976), citado con aprobación en *Marrero v. Mun. de Morovis*, 115 D.P.R. 643, 648 (1984), aseveramos lo siguiente sobre el interés estatal en evitar la corrupción mediante la "compra" de candidatos:

> Estimamos que en el contexto constitucional expuesto, son cognoscibles, como objetivos legítimos consustanciales al proceso democrático, medidas razonables tendentes a disminuir las diferencias económicas y ventajas entre los partidos y candidatos por razón de desigualdades en riqueza, a la par que evitar contribuciones cuantiosas e irrestrictas que pudieran comprometer el curso ulterior del gobierno en orden a influencias indebidas o favoritismos por razón de tales aportaciones.

Reconocemos el interés importantísimo del Estado en mantener un ambiente libre de la influencia desmedida que puede ejercer una minoría de grandes intereses económicos sobre los votantes y sobre el comportamiento posterior de figuras políticas y gubernamentales por razón de la "deuda" que se pueda entender se ha contraído ante quien ayudó en la campaña con grandes aportaciones económicas.

La jurisprudencia federal citada por los apelantes no apoya el reclamo de inconstitucionalidad de los límites a las contribuciones establecidos por la Ley Habilitadora. En *Buckley v. Valeo*, 424 U.S. 1 (1976), se sostuvo la constitucionalidad de los límites impuestos a las contribuciones que se podían hacer a candidatos a puestos electivos federales. En dicha opinión el Tribunal Supremo federal expresó del siguiente modo el importante interés estatal que justifica estas restricciones:

> ... [T]he primary interest served by the limitations ... is the prevention of corruption and the appearance of corruption spawned by the real or imagined coercive influence of large financial contributions on candidates' positions and on their actions if elected to office. ...

It is unnecessary to look beyond the Act's primary purpose —to limit the actuality and appearance of corruption resulting from large individual financial contributions— in order to find a constitutionally sufficient justification for the $1,000 contribution limitation. ... To the extent that large contributions are given to secure a political *quid pro quo* from current and potential office holders, the integrity of our system of representative democracy is undermined. ...

Of almost equal concern as the danger of actual *quid pro quo* arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions. *Buckley v. Valeo*, supra, págs. 25–27.

En resumen, en la jurisprudencia federal se ha reconocido la validez de los estatutos dirigidos a preservar la integridad del proceso electoral y la confianza del ciudadano en su Gobierno, mediante mecanismos que eviten tanto la realidad como la apariencia de corrupción, así como las influencias indebidas. *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 788–789 (1978); *Buckley v. Valeo*, supra, pág. 48.

Naturalmente, los intereses gubernamentales y peligros identificados por esta jurisprudencia justifican la imposición de restricciones a contribuciones en el contexto de un referéndum sobre una enmienda constitucional. Es de esperarse que los líderes políticos expresen una posición y hagan campaña en relación con este tipo de referéndum. En la medida en que estos líderes se identifiquen con estas campañas, su futuro político se ve directa y sustancialmente afectado por el resultado del referéndum. En este sentido, está igualmente presente en estas circunstancias el peligro de corrupción, identificado en *Buckley v. Valeo*, supra, dimanante de los favores que dichos líderes podrían deberles a quienes hayan contribuido grandes sumas de dinero a la campaña que la figura política favorece. Esta situación ha sido descrita del siguiente modo por un estudioso de este tema:

Similarly, candidates can ride into office on the coattails of

ballot proposition issues. One way to gain favor with a political candidate may be to contribute heavily to a proposition that he actively supports or even upon which he may be staking his career. In other words, ballot proposition campaigns *can* create political debts. It is not unknown for a politician to campaign actively in support of a ballot proposition favored by a powerful financial interest with whom he later accepts employment. Are political debts being rewarded? Is a politician being "bought"? (Énfasis en el original y escolios omitidos.) J.S. Shockley, *Direct Democracy, Campaign Finance, and the Courts: Can Corruption, Undue Influence, and Declining Voter Confidence be Found?*, 39 U. Miami L. Rev.'377, 386 (1985).

El peligro descrito también está presente en Puerto Rico debido a que aunque los referendos son esencialmente de naturaleza cívica y no están en juego las candidaturas a cargos electivos, durante el proceso han sido utilizados por algunas figuras políticas para adelantar sus respectivas posiciones públicas. Ante el peligro potencial de que algunas figuras traten de convertir un referéndum cívico en un concurso político, se justifica establecer restricciones a los partidos políticos como la cuestionada en el caso de autos.

También existe otro factor que provee justificación adicional para sostener la constitucionalidad de estas restricciones. Los partidos políticos locales, por virtud de la Ley Electoral de Puerto Rico, Ley Núm. 4 de 20 de diciembre de 1977 (16 L.P.R.A. secs. 3001–3383), tienen la opción de recibir fondos del denominado "Fondo Electoral". No hay duda de que una vez se conceden fondos públicos a los partidos políticos, el Estado adquiere mayores facultades para reglamentar lo concerniente a las finanzas de dichos partidos, incluso lo relativo a las contribuciones que se les pueden hacer a estas entidades. Esto puede incluir la imposición de restricciones como las atacadas en el presente caso. Arts. 3.001–3.037 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. secs. 3101–3127. Aun en años que no son de elecciones generales, cada partido, cumplidos ciertos requisitos, puede participar del Fondo Electoral hasta una

cantidad de doscientos mil dólares ($200,000). En vista de la estrecha reglamentación que esta ley impone a los partidos políticos de este país, concluimos que se le pueden establecer a los partidos unas limitaciones como la impuesta por el Art. 19 de la Ley Habilitadora, *supra*, a manera de condición para tener el derecho a participar de concesiones legislativas como el dinero que se provee a través del Fondo Electoral.([19])

Las decisiones del Tribunal Supremo federal en *First National Bank of Boston v. Bellotti,* supra, y en *Citizens Against Rent Control v. Berkeley*, 454 U.S. 290 (1981), no nos obligan a adoptar un resultado contrario. En *Bellotti*, supra, el estatuto que se declaró inconstitucional prohibía toda contribución de cualquier corporación o entidad bancaria a una campaña en relación con una propuesta de enmienda a la Constitución de Massachusetts. A diferencia de *Bellotti,* supra, nuestro estatuto no prohíbe toda contribución; solamente fija un límite al monto de las contribuciones que puede hacer una persona natural o jurídica a cada uno de los partidos o grupos que estén haciendo campaña en relación al referéndum. Aunque el Art. 19(b), 16 L.P.R.A. sec. 956r(b), prohíbe toda contribución de parte de ciertas instituciones financieras, en este caso, a diferencia de *Bellotti*, supra, ninguna de las partes está directamente afectada por dicha prohibición absoluta (las organizaciones que impugnan estos límites tienen una oportunidad razonable de recaudar fondos de toda persona natural o jurídica no incluida en el grupo descrito en el inciso (b) del Art. 19, *supra.*)

Por otro lado, los límites a las contribuciones que se invalidaron en *Citizens Against Rent Control v. Berkeley,* supra, eran de doscientos cincuenta dólares ($250) por persona, cantidad sustancialmente menor que la impuesta

---

([19]) Usando un razonamiento similar, el Tribunal Supremo federal, en *Buckley v. Valeo*, 424 .U.S. 1 (1976), sostuvo la constitucionalidad de límites a la cantidad de gastos en que podrían incurrir los candidatos que se acogieran al financiamiento público para sus campañas a puestos electivos federales.

como tope por nuestro estatuto. Se sostuvo que el interés adelantado por la ciudad de Berkeley para justificar estos topes, dar a conocer la identidad de los que apoyan y de los que se oponen a iniciativas electorales, no era suficiente dado que ya existían medidas en dicha jurisdicción relativas a la divulgación de las fuentes de financiamiento de las distintas campañas, requisitos que no están presentes en Puerto Rico. En Berkeley se exigía que se publicara en periódicos, dos (2) veces durante los últimos siete (7) días de la campaña, una lista de todo el que hubiese contribuido más de cincuenta dólares ($50) a favor o en contra de alguna de las iniciativas.

En vista de los intereses de alta jerarquía que justifican las restricciones impugnadas, de nuestra anterior jurisprudencia y de las características particulares de nuestro ordenamiento electoral y de nuestra sociedad, sostenemos la validez del Art. 19 de la Ley Habilitadora, *supra*.

## IX

En síntesis, por las razones anteriormente expuestas procede que se declare inconstitucional la Resolución Concurrente Núm. 14, *supra*, que propone añadir una Sec. 20 al Art. VII de la Constitución, *supra*, para establecer unos límites a los términos que una persona podrá servir en los cargos de Gobernador, Legislador y Alcalde. Esta disposición es inconstitucional por violar el requisito de separación de la Sec. 1 del Art. VII de la Constitución, *supra*, al presentar tres (3) proposiciones de enmienda como una (1). Por otro lado, estas tres (3) proposiciones, unidas a las de fianza y de fijación del número de Jueces del Tribunal Supremo, exceden el número de enmiendas que la Constitución permite que se puedan presentar al pueblo en un referéndum.

Además, se ordena a la Comisión Estatal a que, como parte de su deber estatutario de informar y orientar al

pueblo sobre el contenido de las enmiendas propuestas, prepare una campaña educativa sobre el significado de las enmiendas y sobre las razones para votar a favor y en contra de éstas. Por ser parte integral de la Comisión Estatal, los Comisionados Electorales deberán participar plenamente en su preparación y divulgación. Reafirmamos el postulado básico de que en la votación sobre enmiendas constitucionales existe el deber afirmativo del Estado y de sus organismos de propiciar la más amplia divulgación de información y orientación sobre las razones a favor y en contra de los cambios propuestos. Así nos aseguramos que una votación tan trascendental en nuestra vida colectiva refleje la opinión libre, consciente y deliberada de todos los electores.

El referéndum pautado para el 6 de noviembre de 1994 puede celebrarse con las modificaciones que aquí ordenamos; de esta manera, se garantiza que el pueblo esté debidamente informado sobre las proposiciones de enmienda y se le da fiel cumplimiento a nuestra Constitución, máxima expresión de nuestras aspiraciones como pueblo.

## X

A modo de epílogo, exhortamos a todos aquellos que participan en el diálogo público del Referéndum del próximo 6 de noviembre a formular y divulgar sus mensajes en un plano de altura que contribuya al fortalecimiento de nuestra vida democrática. Todos debemos recordar que la demagogia y el ataque personal, no importa de quien provenga, no sólo nublan el entendimiento del elector sino que socavan las instituciones democráticas y destruyen la convivencia civilizada.

Por último, no olvidemos que en el 1952, cuando se aprobó la Constitución del Estado Libre Asociado de Puerto Rico, nuestro pueblo instituyó un sistema de gobierno democrático basado en el mandato de la ley. A la

hora de interpretar y enmendar la Constitución nos sirve de norte la expresión del Juez Benjamín N. Cardozo: "Una Constitución no establece, ni debe establecer normas para la hora que pasa, sino principios para un futuro que se expande".

*Se dictará la sentencia correspondiente.*

El Juez Presidente Señor Andréu García emitió una opinión de conformidad. El Juez Asociado Señor Fuster Belingeri está conforme, pero además hubiera ordenado la utilización de dos (2) papeletas separadas. Los Jueces Asociados Señores Negrón García y Rebollo López emitieron sendas opiniones disidentes. La Juez Asociada Señora Naveira de Rodón emitió una opinión disidente en parte y concurrente en parte. Todos los Jueces se reservan el derecho de emitir opiniones adicionales.

— O —

Opinión de conformidad del Juez Presidente Señor Andréu García.

**Vivir es expresarse. Vivir es necesario. El hombre no sólo vive, sino que hace su vida. Para esta función posee la palabra: El nombrar las cosas es un modo de construir su mundo vital.**

Heidegger

En nuestro sistema constitucional de gobierno compuesto de tres (3) poderes igualmente subordinados a la soberanía del Pueblo, el Poder Judicial es el llamado a administrar la justicia; es decir, a obtener que las normas jurídicas se cumplan en aquellos casos concretos en que han sido violadas o menoscabadas. En virtud de esa función, es al Poder Judicial a quien le corresponde definir los límites del ejercicio de los demás poderes. Por ello, es obligación exclusiva del Tribunal Supremo ser el intérprete final de la Constitución. Véase, entre otros, *Pueblo v. Gon-*

*zález Malavé,* 116 D.P.R. 578 (1985). En *Silva v. Hernández Agosto,* 118 D.P.R. 45, 55 (1986), señalamos que: "La interpretación inicial que de la Constitución haga otra rama merece deferencia, pero debe prevalecer la norma de que la determinación final corresponde a los tribunales. ... Nuestra estructura de gobierno no permite que las ramas políticas del Gobierno se conviertan en árbitros de sus propios actos." Véase, además, *C.E.S. v. Gobernador I,* 134 D.P.R. 350 (1993), voto particular.

En el descargo de dicha función, los jueces tenemos que ser prudentes y cuidadosos, dando especial deferencia a las otras dos (2) ramas de gobierno, cuyos componentes son directamente electos por el Pueblo. Para ello, debemos agotar todos los recursos de legítima creación jurídica a nuestro alcance para, en virtud de tal deferencia, tratar de lograr un balance racional, justo y adecuado entre la voluntad de las otras dos (2) ramas y los postulados constitucionales. A pesar de todos los esfuerzos que debemos los jueces ejercer con ese propósito, no siempre podemos alcanzarlo debido a que muchas veces el imperativo constitucional no lo permite. En otras ocasiones, como en la presente, el objetivo puede obtenerse parcialmente.

La decisión en este caso es el resultado de un concienzudo y ponderado análisis, tomando en cuenta todos los factores anteriormente apuntados frente al reconocimiento de los valores democráticos que están en juego. Debe darse paso a la expresión popular según se persigue en el referéndum del próximo 6 de noviembre en aquella forma dispuesta por la Asamblea Legislativa que no resulte contraria a los postulados de nuestra Constitución. Por ello imparto mi voto de conformidad a dicha decisión. De conformidad con ésta, no es necesario, a menos que así lo estime la Legislatura, posponer tal referéndum respecto a las enmiendas constitucionales propuestas para limitar el presente derecho absoluto a la fianza y para modificar la composición de este Tribunal, fijando el número de sus miem-

bros en un Juez Presidente y ocho (8) Jueces Asociados, eliminando así la disposición que faculta a la Legislatura a modificar por ley dicha composición a solicitud del propio Tribunal.

La actuación de la mayoría de los miembros de esta Curia constituye, como siempre, la expresión libre e informada de sus conciencias individuales, guiadas exclusivamente por su deseo de hacer cumplida justicia al Pueblo de Puerto Rico y de hacer valer la voluntad de sus representantes electos en todo aquello que no choque con las prohibiciones constitucionales discutidas en la opinión mayoritaria. Ninguna otra consideración ha influenciado dicha decisión.

Por ello es importante enfatizar que la participación de los jueces en actividades que propendan al mejoramiento del Derecho y del sistema de impartir justicia, autorizada por el Canon III de Ética Judicial, 4 L.P.R.A. Ap. IV-A, no constituye obstáculo o impedimento alguno al ejercicio libre, juicioso y objetivo de la función judicial. Menos aún cuando dicha actividad consiste, *precisamente*, en la defensa del principio rector de esa función: *la independencia judicial*. En este sentido acuden a nuestra mente las siguientes palabras pronunciadas por el Juez Asociado de este Tribunal Señor Negrón García en su voto de inhibición emitido en *In re Solicitud Cepeda García*, 130 D.P.R. 18, 32 (1992):

> A fin de cuentas, quienes pueden "politizar" el principio de independencia judicial, ínsito en la separación de poderes, son los políticos, *no los jueces. Abandonar su defensa*, por esa razón, *es inconcebible.* (Énfasis suplido.)

Con mayor énfasis se expresó sobre este aspecto en el *caso citado*, el también Juez Asociado de este Tribunal Señor Rebollo López, cuyas palabras citamos a continuación:

> Debe quedar meridianamente claro que para el Juez suscribiente la dignidad judicial y la independencia judicial no son negociables. En consecuencia, nada ni nadie podrá nunca ame-

drentarnos ni evitar que continuemos, con ahínco y sin temor de clase alguna, defendiendo esa dignidad e independencia judicial.

. . . . . . . .

Desafortunadamente, en un mundo donde existen personas de criterios vacilantes, cautivos y serviles, las posiciones firmes resultan difíciles de entender para éstos y, en ocasiones, son calificadas por ellos como impropias y atrevidas. Las "armas" con que cuenta el Juez, cuales son la palabra y su pluma, deben y pueden ser utilizadas en forma franca y vigorosa ya que esas "armas" son las únicas que tenemos los jueces a nuestro alcance para defender las causas justas y para denunciar situaciones, como la presente, que afectan el bienenestar y la independencia de la Judicatura puertorriqueña. (Énfasis suprimido.) *In re Solicitud Cepeda García*, supra, págs. 35–36.

Hacemos nuestras las siguientes palabras del Hon. Arturo Hoyos pronunciadas en el acto de toma de posesión de su cargo de Presidente de la Suprema Corte de Justicia de Panamá:

Es cierto, para finalizar, que el Organo Judicial tiene críticos. Unos son personas seriamente interesadas en los problemas de la justicia; algunos son individuos cuyas pretensiones no han sido beneficiadas por los jueces; y otros, en frase del Nóbel Octavio Paz, "son gente que tiene tan larga la lengua como corto el entendimiento". Todas las críticas que se nos formulen serán, no obstante, evaluadas con serenidad y, si fueran atendibles, tomaremos las acciones correctivas necesarias. *Pero no podemos dejarnos abatir por las críticas.* (Énfasis suplido.)

**— O —**

Opinión disidente en parte y concurrente en parte emitida por la Juez Asociada Señora Naveira de Rodón.

Por no estar de acuerdo con la Mayoría de los miembros de esta Curia en que adolecen de defectos constitucionales, tanto la Resolución Concurrente de la Cámara Núm. 14 de 13 de diciembre de 1993 como la parte del Art. 2 de la Ley Habilitadora del Referéndum Sobre Enmiendas a la Constitución de Puerto Rico de 1994, Ley Núm. 49 de 2 de

agosto de 1994 (en adelante Ley Habilitadora del Referéndum), 16 L.P.R.A. sec. 956a, que propone añadir una Sec. 20 al Art. VI de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, para fijar el número de términos para los cargos de Gobernador, Legisladores y Alcaldes, disentimos de las Partes II, III, IV, V y VI de la opinión que apoyan la tesis de inconstitucionalidad. También disentimos de la Mayoría en tanto y en cuanto ésta entiende que el Art. 19 de la Ley Habilitadora del Referéndum, 16 L.P.R.A. sec. 956r, es constitucional. De otra parte, concurrimos con la Mayoría en cuanto a que el Art. 7 de dicha ley (16 L.P.R.A. sec. 956f) obliga a la Comisión Estatal de Elecciones (en adelante C.E.E.) a orientar adecuadamente a la ciudadanía, no solo sobre la forma de votar y sobre el contenido de las enmiendas, sino también sobre el significado de éstas, esgrimiendo los argumentos que se pueden esbozar para sostener la razón de votar a favor y en contra de cada una de ellas.

Creemos, sin embargo, que debe dejarse a la discreción de la C.E.E. el estructurar la forma y manera de implantar efectivamente esta encomienda, bien utilizando el método que sugiere la Mayoría o cualquier otro que estime mejor para lograr el propósito de informar y educar al Pueblo sobre las enmiendas propuestas.

Es norma reiterada por este Tribunal que la aplicación e interpretación administrativa de una ley por aquellos organismos particularmente encargados de ponerla en vigor y velar por que sus fines se cumplan, merecen gran consideración y respeto por los tribunales, en vista de la vasta experiencia y el conocimiento de estos organismos sobre las materias que le han sido encomendadas. Por ello, no debemos intervenir en sus quehaceres más allá de lo que sea realmente necesario. Véanse: *Monllor & Boscio v. Comisión Industrial*, 89 D.P.R. 397, 405 (1963); *Rodríguez v. Comisión Industrial*, 99 D.P.R. 368, 375 (1970); *Murphy Ber-*

*nabe v. Tribunal Superior*, 103 D.P.R. 692, 699 (1975); *A.R.P.E. v. Ozores Pérez*, 116 D.P.R. 816, 821 (1986); *Agosto Serrano v. F.S.E.*, 132 D.P.R. 866 (1993); *Torres v. Star Kist Caribe, Inc.*, 134 D.P.R. 1024 (1994).

Los hechos en este caso no reflejan que existan circunstancias especiales que ameriten el que se haga una excepción a la norma que consistentemente hemos aplicado sobre deferencia a las agencias y entidades administrativas con respecto a las materias que tienen a su cargo.

## I

La Ley Habilitadora del Referéndum se aprobó con el propósito de disponer para la celebración de un referéndum el 6 de noviembre de 1994. En éste se someterán al Pueblo de Puerto Rico, para su aprobación o rechazo, tres (3) proposiciones de enmienda a la Constitución del Estado Libre Asociado de Puerto Rico. Dichas proposiciones de enmienda surgen de tres (3) Resoluciones aprobadas por la Asamblea Legislativa.

La primera propuesta surge de la Resolución Concurrente de la Cámara Núm. 32 de 16 de mayo de 1994, en la cual se propone enmendar la Sec. 11 del Art. II de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, para limitar el derecho absoluto a la fianza. La segunda propuesta surge de la Resolución Concurrente del Senado Núm. 44 de 6 de julio de 1994, que propone enmendar la Sec. 3 del Art. V de nuestra Constitución, L.P.R.A., Tomo 1, para establecer que el Tribunal Supremo de Puerto Rico se compondrá de un número fijo de Jueces: un Juez Presidente y ocho (8) Jueces Asociados. La tercera propuesta surge de la Resolución Concurrente de la Cámara Núm. 14, *supra*, en la cual se propone enmendar la Constitución para añadirle una Sec. 20 al Art. VI, *supra*, y para limitar

246

los términos de ciertos cargos electivos, estos son, Gobernador, Senador, Representante y Alcalde.(¹)

Algunos de los peticionarios en los casos consolidados alegan que la Ley Habilitadora del Referéndum infringe la Sec. 1 del Art. VII de nuestra Constitución, L.P.R.A., Tomo 1.(²) En específico, impugnan la validez constitucional de la Resolución Concurrente de la Cámara Núm. 14, *supra,* que tiene el propósito de limitar los términos a los que una persona puede ser electa a los cargos anteriormente mencionados. De acuerdo con estos peticionarios, la ley es inconstitucional porque incumple con el requisito del límite máximo de tres (3) propuestas establecido en la Sec. 1 del Art. VII de la Constitución, *supera.* Reclaman que en dicha Resolución se encuentran, en realidad, en una sola oración, hasta cinco (5) enmiendas constitucionales propuestas, a saber: (1) enmienda el tiempo que una persona puede ser Gobernador; (2) enmienda el tiempo que una persona puede ser Senador; (3) enmienda el tiempo que una persona puede ser Representante; (4) enmienda el tiempo que una persona puede ser Alcalde, y (5) da rango constitucional a la figura del Alcalde.(³)

Unido a lo anterior, señalan los peticionarios que la ley

---

(¹) No se incluyeron los cargos de Comisionado Residente en Washington y los de Asambleístas Municipales.

(²) Dicha sección dispone:

"La Asamblea Legislativa podrá proponer enmiendas a esta Constitución mediante resolución concurrente que se apruebe por no menos de dos terceras partes del número total de los miembros de que se componen cada cámara. Toda proposición de enmienda se someterá a los electores capacitados en referéndum especial .... Cada proposición de enmienda deberá votarse separadamente y en ningún caso se podrán someter más de tres proposiciones de enmienda en un mismo referéndum. Toda enmienda contendrá sus propios términos de vigencia y formará parte de esta Constitución si es ratificada por el voto de la mayoría de los electores que voten sobre el particular. ... " Art. VII, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 380.

(³) Nuestra Constitución no contiene disposición alguna que limite el tiempo en que una persona pueda ocupar cualquiera de los primeros tres (3) cargos electivos mencionados. Tampoco existe disposición alguna referente a la figura del Alcalde. Este cargo existe en virtud de ley, y actualmente está regido por la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991, Ley Núm. 81 de 30 de agosto de 1991 (21 L.P.R.A. sec. 4001 *et seq.*).

La única disposición referente a los municipios que tiene nuestra Constitución es la Sec. 1 del Art. VI de la Constitución del E.L.A., L.P.R.A., Tomo 1. Ésta dispone:

y la Resolución impugnadas constituyen un claro ejemplo de pase de rolo (*logrolling*),(⁴) lo que, argumentan, impedirá al elector ejercer su derecho al voto de manera adecuada, ya que éste puede apoyar que se limiten los términos de los Legisladores y no apoyar que se limite el término del Gobernador, y viceversa. Según los peticionarios, el elector está impedido de apoyarlas o rechazarlas separadamente, por lo que se le está forzando a votar igual por todas.

La mayoría de este Tribunal acoge, en parte, este planteamiento y resuelve que la Ley Habilitadora del Referéndum, en cuanto ordena someter a votación la limitación de los términos de los cargos de Gobernador, Legislador y Alcalde, es inconstitucional por violar el requisito de separabilidad al presentar tres (3) proposiciones de enmienda como una sola. Además, resuelve que estas tres (3) proposiciones, unidas a las de fianza y fijación del número de Jueces, exceden el número de enmiendas que se puede presentar al Pueblo en una sola elección.

## II

"En una democracia, la fuerza de una Constitución depende de dos (2) factores: *a)* del grado hasta dónde sus disposiciones sean materia de acuerdo general al tiempo de

---

"La Asamblea Legislativa tendrá facultad para crear, suprimir, consolidar y reorganizar municipios, modificar sus límites territoriales y determinar lo relativo a su régimen y función; y podrá autorizarlos, además, a desarrollar programas de bienestar general y a crear aquellos organismos que fueren necesarios a tal fin.

"Ninguna ley para suprimir o consolidar municipios tendrá efectividad hasta que sea ratificada, en referéndum, por la mayoría de los electores capacitados que participen en el mismo en cada uno de los municipios a suprimirse o consolidarse. La forma del referéndum se determinará por ley que deberá incluir aquellos procedimientos aplicables a la legislación electoral vigente a la fecha de la aprobación de la ley." Art. VI, Sec. 1, Const. E.L.A., *supra*, ed. 1982, pág. 362.

(⁴) El pase de rolo (*logrolling*) se ha definido como la práctica de incluir en un estatuto o enmienda constitucional más de una propuesta, lo que induce a los electores a votar por la totalidad de la medida aun cuando éstos no hubiesen votado por su totalidad si varias enmiendas o estatutos se hubiesen sometido separadamente. *New Progressive Party v. Hernández Colón*, 779 F. Supp. 646, 660 esc. 15 (D. P.R. 1991).

su adopción, y *b)* del grado en que puede ser modificada más tarde, según ocurran cambios en los asuntos en que la sociedad está generalmente de acuerdo." *La Nueva Constitución de Puerto Rico*, Río Piedras, Ed. U.P.R., 1954, Parte II, pág. 519. Estos dos (2) factores son esenciales para mantener el carácter fundamental de una Constitución, esto es, su característica de durabilidad basada en el consenso y su modificabilidad para reflejar los cambios que ocurren en la sociedad con el correr de los años. Íd., pág. 520.

"La cláusula de enmienda, más que ninguna otra, da vida a la constitución. La enmienda formal, así como los cambios traídos por la costumbre y la interpretación judicial, constituyen el procedimiento por el cual puede la constitución continuar reflejando la realidad social y proporcionar una base para el gobierno, de acuerdo a las necesidades sociales contemporáneas." *La Nueva Constitución de Puerto Rico, op. cit.*, pág. 520. "[E]llo depende en gran parte del carácter de la cláusula de enmienda. Si la constitución ha de ser flexible para los efectos indicados, el procedimiento de enmienda debe ser sencillo y manejable." Íd.

Al adoptarse la Constitución del Estado Libre Asociado de Puerto Rico, se favoreció que las enmiendas constitucionales fueran propuestas mediante iniciativa de la Asamblea Legislativa o mediante una Convención Constituyente electa en conformidad con el texto constitucional. En la Constitución se dispuso la participación directa del ciudadano, no sólo en la proposición de enmiendas constitucionales a través de sus representantes electos, sino que se acogió el principio de que el ciudadano "debe sin excepción tener el derecho, como trámite final en todo proceso de enmienda, de votar en un referéndum a favor o en contra del cambio propuesto". *La Nueva Constitución de Puerto Rico, op. cit.*, pág. 522. Estas normas constitucionales están con-

tenidas en la Sec. 1 del Art. VII de la Constitución del Estado Libre Asociado, *supra.*

"El propósito principal del referéndum es, por supuesto, determinar si el cambio propuesto a la ley fundamental tiene o no el respaldo del electorado. Si la cláusula Constitucional sobre el referendúm está bien redactada, tendrá disposiciones para la consecución del objetivo a través de dos medios: uno, estableciendo condiciones que permitan al pueblo familiarizarse con las disposiciones de la enmienda propuesta y, de este modo, votar con conocimiento de causa; y el otro, estableciendo condiciones por cuya virtud la votación total refleje, con la mayor exactitud posible, la actitud del electorado hacia la proposición." *La Nueva Constitución de Puerto Rico, op. cit.,* págs. 531–532. Las disposiciones constitucionales sobre la revisión de la Constitución limitan el poder de la Asamblea Legislativa. De igual forma, la prohibición de que no pueden someterse más de tres propuestas también constituye una limitación a la Asamblea Legislativa. Esta última limitación, además, tiene el propósito de establecer las "condiciones que permitan al pueblo familiarizarse con las disposiciones de la enmienda propuesta y, de este modo, votar con conocimiento de causa ...". Íd. Esta condición está basada en el siguiente razonamiento:

> Para que los ciudadanos voten con conocimiento de causa, no se les debe sobrecargar sometiéndoles varias enmiendas a la vez. Es importante, por lo tanto, que se imponga alguna clase de límite al número de enmiendas que puede someterse al electorado. *La Nueva Constitución de Puerto Rico, op. cit.,* pág. 532.

La Asamblea Constituyente no consideró problemática en su interpretación la limitación numérica de tres (3) propuestas, razón por la que nada surge en el debate de la Constituyente, excepto que el proceso enmendatorio constitucional proviene de la tradición norteamericana. 2 Dia-

rio de Sesiones de la Convención Constituyente 1365–1367 (1961). Por lo menos, dieciocho (18) estados de la Unión americana incluyen en sus Constituciones el requisito de separabilidad de asuntos.[5]

La controversia presentada por los peticionarios en cuanto a la constitucionalidad del Art. 2 de la Ley Habilitadora del Referéndum, *supra*, y la Resolución Concurrente Núm. 14, *supra*, en particular, el aspecto de pase de rolo (*logrolling*) es novel en nuestra jurisdicción. Este Tribunal no había tenido la oportunidad de expresarse anteriormente sobre este asunto.[6]

---

[5] Ariz. Rev. Stat. Ann. Art. XXI Sec. 1 (1984); Ark. Code Ann. Art. 19 Sec. 22 (Bobbs-Merril 1947); Colo. Stat. Art. XIX Sec. 2; Idaho Code Art. 20 Sec. 2 (1932); Indiana Code Ann. Art. 20 Sec. 2 (Burns 1955); Iowa Code Ann. Art. 10 Sec. 2 (West 1949); Kan. Stat. Ann. Art. XIV Sec. 1; Minn. Stat. Art. IX Sec. 1; N.M. Stat. Ann. Art. XIX Sec. 1; Ohio Rev. Code Ann. Art. XVI Sec. 1 (Anderson 1994); Okla. Stat. Art. XXIV Sec. 1; Or. Stat. Art. XVII Sec. 1; Pa. Stat. Ann. Const. Art. XI Sec. 1; Wash. Rev. Code Ann. Art. XXIII Sec. 1; W. Va. Code Art. 14 Sec. 2; Wis. Stat. Ann. Art. XII Sec. 1 (West 1986); Wyo. Stat. Art. 20; Md. Code Ann. Const. Art. XIV Sec. 1 (1981).

[6] Nuestra disposición constitucional sí fue atendida indirectamente por el Tribunal de Distrito de Estados Unidos en Puerto Rico en el caso *New Progressive Party v. Hernández Colón*, supra, donde se impugnó el referéndum que se iba a celebrar el 8 de diciembre de 1991 por razón de inconstitucionalidad. Uno de los argumentos levantados por los demandantes fue que la propuesta contenía más de un asunto, violando así la Sec. 1 del Art. VII de la Constitución del E.L.A., L.P.R.A., Tomo 1. Íd., pág. 659. El mencionado referéndum disponía de un voto "Sí" o "No" a unas propuestas agrupadas en un solo bloque, compuesta por seis (6) "derechos democráticos" conforme lo establecían la Ley Núm. 85 de 17 de septiembre de 1991 (1 L.P.R.A. sec. 21 *et seq.*) y la Ley Núm. 86 de 2 de octubre de 1991 (16 L.P.R.A. sec. 955 *et seq.*).

Se disponía enmendar la Constitución de la forma siguiente:

"Nosotros, el Pueblo de Puerto Rico, solemnemente reclamamos que se garantice en nuestra Constitución los siguientes derechos democráticos:

"-el derecho inalienable a determinar libre y democráticamente nuestro status político

"-el derecho a escoger un status de plena dignidad política sin subordinación colonial ni territorial, a los poderes plenarios del Congreso

"-el derecho a votar por las tres alternativas de status, de Estado Libre Asociado, Estadidad e Independencia, fundamentadas en la soberanía del Pueblo de Puerto Rico

"-el derecho a que la alternativa triunfante en una consulta de status requiera más de la mitad de los votos emitidos

"-el derecho a que toda consulta sobre status garantice, bajo cualquier alternativa, nuestra cultura, idioma e identidad propia, que incluye nuestra representación deportiva internacional

"-el derecho a que toda consulta sobre status garantice, bajo cualquier alternativa, la ciudadanía americana que salvaguarda la Constitución de los Estados Uni-

Varios tribunales estatales de Estados Unidos de América han evaluado propuestas de enmiendas constitucionales para determinar si éstas presentan más de una propuesta sin darle oportunidad a los electores de votar en ellas por separado.

Se ha reconocido que, a los efectos de determinar si existe más de una propuesta de enmienda, debe examinarse no si se trata de más de un sujeto, sino si incluye, por lo menos, dos (2) propósitos distintos, separados e independientes.(⁷) No se pueden incluir en una sola propuesta cuestiones separadas no relacionadas.(⁸)

Se ha decidido que una propuesta consiste de una sola

---

dos de América."

Esta Reclamación constituye un reclamo al Gobierno de Puerto Rico para que estos derechos se consagren en la Constitución del Estado Libre Asociado de Puerto Rico y una petición al Presidente de los Estados Unidos y al Congreso para que estos derechos sean respetados al actuar sobre nuestro status político."

Explicó el tribunal que al autorizar un referéndum o una iniciativa constitucional, la legislación que dispone sobre ese tipo de proceso no puede abandonar las salvaguardas constitucionales. Para evitar esas trampas y minimizar el riesgo de confundir o engañar al elector, muchas jurisdicciones requieren que una propuesta no contenga más de un (1) asunto. *Id*, pág. 659. Concluyó el Tribunal de Distrito Federal que el referéndum incluía seis (6) propuestas que inducían al elector a votar por todas, sin considerar que éstos podrían votar por solo algunas de haberse sometido separadas. Íd. Por tal razón, resolvió que la legislación impugnada constituía un claro ejemplo de pase de rolo (*logrolling*), práctica que fue rechazada explícitamente en nuestra Constitución en la Sec. 1 del Art. VII de la Constitución del E.L.A., *supra*. Íd., pág. 660. El antedicho referéndum no fue interdicho debido a otras razones.

Cabe señalar que lo dicho por el Tribunal de Distrito Federal en ese caso es *dictum* toda vez que estaba impedido de analizar esa controversia. Véanse las págs. 653 y 660 de la opinión. No obstante, es importante aclarar que el asunto tratado era distinto al que nos ocupa. En dicha situación existía una sola propuesta de enmienda compuesta por un catálogo de derecho unidos en un solo bloque. Una simple lectura de éstas demuestra que verdaderamente se trataban de asuntos disímiles y poco armonizables.

(⁷) En *State v. Timme*, 11 N.W. 785, 791 (1882) se expresó:

"We think amendments to the constitution, which the section above quoted requires shall be submitted separately, must be construed to mean amendments which have different objects and purposes in view. *In order to constitute more than one amendment, the propositions submitted must relate to more than one subject, and have at least two distinct and separate purposes not dependent upon or connected with each other.*" (Énfasis suplido.)

Véanse, además: *City of Coral Gables v. Gray*, 19 So.2d 318 (1944); *City of Raton v. Sproule*, 429 P.2d 336 (N.M. 1967); *Moore v. Shanahan*, 486 P.2d 506 (Kan. 1971); *State Ex Rel. Roahrig v. Brown*, 282 N.E.2d 584 (1972); *Milwaukee Alliance, etc. v. Elections Bd., etc.*, 317 N.W.2d 420 (1982).

(⁸) *Coalition for Political Honesty v. State Bd.*, 415 N.E.2d 368 (1981).

enmienda en la medida en que cada uno de los sujetos tenga una relación razonable con el único propósito de la enmienda propuesta.(⁹) El hecho de que una propuesta de enmienda se pueda separar en dos (2) o más proposiciones, atendiendo de esa forma las diferentes opciones que podrían surgir, no es suficiente para concluir que la propuesta enmienda es inconstitucional si éstas persiguen el mismo propósito general.(¹⁰) De igual forma se ha resuelto que una propuesta enmienda constitucional que tiene un solo propósito, y su contenido esta relacionado incidental y necesariamente con el propósito de la enmienda, es constitucional. El hecho de que la propuesta enmienda pueda afectar otras disposiciones de la Constitución no necesariamente significa que se trata de más de una enmienda constitucional.(¹¹)

El requisito constitucional de presentar separadamente cualquier propuesta de enmienda no conlleva que cualquier alteración de una frase, cláusula o disposición de la Constitución tenga que someterse al Pueblo mediante una propuesta separada.(¹²) Asimismo, se ha establecido la regla de que una enmienda constitucional que envuelva a varios sujetos, que sean compatibles con el sujeto general de la enmienda, será considerada válida y podrá someterse al Pueblo como una sola propuesta de enmienda.(¹³)

En resumen, para fines de una enmienda constitucional, las diferentes frases configuran una sola propuesta si

---

(⁹) *People v. Sours*, 74 P. 167 (1903); *Gottstein v. Lister*, 153 P. 595 (1915); *Kerby v. Luhrs*, 36 P.2d 549 (Ariz. 1934); *Moore v. Brown*, 165 S.W.2d 657 (1942); *State v. City of Baton Rouge*, 40 So. 2d 477 (1949); *Funk v. Fiedler*, 243 S.W.2d 474 (1951); *State v. Holman*, 296 S.W.2d 482 (1956); *Graham v. Miller*, 84 N.W.2d 46 (1957); *Fugina v. Donovan*, 104 N.W.2d 911 (1960); *State Ex Rel. Roahrig v. Brown*, supra; *Carter v. Burson*, 198 S.E.2d 151 (1973); *Hood v. State*, 539 P.2d 931 (Ariz. 1975); *Idaho Water Resource Board v. Kramer*, 548 P.2d 35 (Idaho 1976).

(¹⁰) *City of Raton v. Sproule*, supra.

(¹¹) *State v. Cook*, 185 N.E. 212 (1932); *State v. Greater Portsmouth Growth Corp.*, 218 N.E.2d 446 (1966).

(¹²) *Fugina v. Donovan*, supra.

(¹³) *Hammond v. Clark*, 71 S.E. 479 (1911); *Gottstein v. Lister*, supra; *Kerby v. Luhrs*, supra; *People v. Sours*, supra.

están unidas por un solo principio. Lo importante es que la enmienda propuesta se refiera a un solo propósito, independientemente que afecte a más de un sujeto.

Finalmente, también se ha decidido que al evaluar una propuesta de enmienda constitucional originada en la Legislatura, los tribunales deben observar gran deferencia hacia la determinación legislativa.[14] Los tribunales estatales se han mostrado renuentes a invalidar una determinación legislativa referente a que una propuesta de enmienda involucra un solo propósito general.[15]

### III

En el caso que nos ocupa, los cambios propuestos tienen un propósito común: limitar el número de términos a los que puede ser electo un candidato a los cargos electivos de Gobernador, Senador, Representante y Alcalde. El hecho de que algún elector desee votar por limitar solamente el término al que pueda ser electo, por ejemplo, el Gobernador, no es suficiente para declarar la legislación impugnada inconstitucional. Lo determinante, a nuestro entender, es que el objetivo perseguido y los cambios propuestos sean afines. Todas las partes en las que se podría dividir la propuesta se dirigen a cumplir el mismo objetivo: limitar el número de términos de los antedichos cargos electivos, desalentar el continuismo político y fomentar la postulación de personas nuevas para dichos cargos. Véanse: Exposición de Motivos de la Ley Habilitadora del Referéndum y la Resolución Concurrente Núm. 14, *supra.* Ese es el mensaje que se le quiere llevar a los electores, el cual, a nuestro entender, es de fácil entendimiento y no está sujeto a confusiones.

---

[14] *City of Raton v. Sproule,* supra.

[15] *City of Raton v. Sproule,* supra; *In re Initiative Petition No. 271, State Question No. 408,* 373 P.2d 1017 (Okl. 1962).

Todo lo expuesto, nos lleva a concluir que no existe problema constitucional alguno con la propuesta de enmienda en términos del llamado "pase de rolo" (*logrolling*). Las partes en que podría subdividirse la enmienda propuesta se relacionan razonablemente con el propósito general que ésta persigue.[16]

Consideramos que esta interpretación debió ser la adoptada por este Foro. Estamos plenamente convencidos que al enfrentarnos a un tipo de legislación de naturaleza tan sensitiva como la que hoy consideramos, debemos darle gran deferencia a los propósitos legislativos. El Poder Judicial, al evaluar los méritos de una propuesta de enmienda constitucional, no debe hacerlo de forma estricta. Los propósitos perseguidos por la Legislatura, aunque éstos no sean de nuestro agrado, deben prevalecer si no están en abierta contradicción con alguna disposición constitucional. En última instancia, la sabiduría de si se debe enmendar la Constitución la deben evaluar los ciudadanos que voten por la propuesta.

Ahora bien, ello no quiere decir que debamos vacilar en adjudicar problemas relacionados con el procedimiento de enmendar la Constitución. Debemos estar siempre atentos para intervenir, si fuese necesario, particularmente en aquellas situaciones en que el procedimiento de enmienda pueda estar afectando derechos fundamentales, tales como el derecho a votar de manera informada. Sobre ese particular nos expresaremos a continuación.

---

[16] En cuanto al cargo de Alcalde, consideramos que lo único que la enmienda propuesta hace es limitar la cantidad de tiempo en que pueden permanecer en sus puestos. A nuestra manera de ver, de forma alguna se está incorporando el cargo de Alcalde en la Constitución. Siempre que existan los cargos de Alcalde por disposición de ley, estarán sujetos a la limitación propuesta. De no haberlos, el mecanismo será claramente inaplicable.

# IV

Una de las partes peticionarias, Movilización Civil, plantea que el Art. 19 de la Ley Habilitadora del Referéndum, *supra*, al imponer unos límites a las contribuciones a partidos políticos y agrupaciones civiles que participen en el referéndum, es contrario al principio constitucional sobre la libertad de expresión.[17] Señala que el Tribunal Supremo federal ha limitado las restricciones sobre contribuciones a campañas políticas a los casos de candidatos a puestos electivos y no las ha permitido en aquellos eventos electorales en los que se vota por propuestas o temas políticos. Contrario a la mayoría de este Tribunal, acogeríamos dicho planteamiento.

Ciertamente, las contribuciones económicas y la solvencia de los partidos políticos pueden afectar el desenlace final de un proceso electoral. *P.N.P. v. Tribunal Electoral*, 104 D.P.R. 741, 751 (1976). Por esto, la Asamblea Legislativa consideró apropiado legislar para mantener la igualdad entre los partidos políticos, en términos de la capacidad para comunicar e informar sus diversas posturas políticas e ideológicas, y para evitar que contribuciones

---

[17] El artículo dispone:

"Ninguna persona natural o jurídica podrá en forma directa o indirecta, hacer contribuciones para la campaña del referéndum de un partido político principal, agrupación, organización, entidad o a grupos independientes que esté a favor o en contra de alguna de las tres propuestas para enmendar la Constitución en exceso de las cantidades indicadas a continuación:

"(a) Las personas naturales o jurídicas podrán hacer contribuciones voluntarias a un partido político o agrupación que esté a favor o en contra de alguna de las propuestas enmiendas a la Constitución en el referéndum hasta una cantidad de mil (1,000) dólares por cada una de las propuestas de enmiendas a la Constitución, para un máximo de tres mil (3,000) dólares.

"(b) Será ilegal toda contribución directa o indirecta de una institución bancaria, de cualquier institución dedicada a prestar dinero; de casas de corretaje dedicadas a la venta de valores; y de corporaciones cuyas acciones se vendan en mercados de valores o al público en general, o de afiliadas o subsidiarias de éstas, hecha para fines de la campaña del referéndum de cualquier partido político o agrupación que represente una de las propuestas enmiendas a la Constitución en el referéndum." Art. 19 (16 L.P.R.A. sec. 956r).

cuantiosas provocaran actuaciones corruptas de parte de los funcionarios públicos.

Estamos de acuerdo con la norma de que las disposiciones legales en materia de finanzas políticas sostienen el enfoque de estricto escrutinio judicial en cuanto a la imposición de límites a las aportaciones que reciben los partidos y los candidatos para sufragar los gastos en procesos eleccionarios, *P.N.P. v. Tribunal Electoral,* supra, págs. 753–755.[18] Sin embargo, estas restricciones legislativas no sostienen el análisis del escrutinio estricto en casos como el de autos, donde lo que está en juego son proposiciones de enmiendas a nuestra Constitución. Adoptaríamos el enfoque del Tribunal Supremo federal que ofrece mayor protección al derecho a la libre expresión.[19] Nos explicamos.

Las decisiones del Tribunal Supremo federal[20] enfatizan que los derechos protegidos por la Primera Enmienda de la Constitución federal, son vulnerados por leyes que reglamentan las donaciones y los gastos en campañas electorales y que dichas leyes deben ser revisadas utilizando el análisis del escrutinio estricto.[21] Los intereses del Estado,

---

[18] Sobre el análisis del escrutinio estricto, véase *Zachry International v. Tribunal Superior,* 104 D.P.R. 267 (1975).

[19] Al interpretar los contornos de la Constitución del Estado Libre Asociado de Puerto Rico, respecto a los derechos fundamentales, los tribunales deben utilizar una visión abarcadora y protectora, ya que nuestra Carta de Derechos es de factura más ancha que la de la Constitución federal. *López Vives v. Policía de P.R.,* 118 D.P.R. 219 (1987).

[20] *Citizens Against Rent Control v. Berkeley,* 454 U.S. 290 (1981); *First National Bank of Boston v. Bellotti,* 435 U.S. 765 (1978); *Buckley v. Valeo,* 424 U.S. 1 (1976).

[21] Somos conscientes de que esta norma ha sido ampliamente discutida y que, como es natural, existen argumentos a su favor y en su contra. Sin embargo, ésta continúa vigente y, para casos como el de autos, creemos que es sabia. Para un estudio sobre el tema, véanse: R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico,* San Juan, Ed. C. Abo. P.R., 1986, Vol. II, págs. 1539–1554; 3 Rotunda, Nowak y Young, *Treatise on Constitutional Law* 278–287 (1986); L.H. Tribe, *American Constitucional Law,* 2da ed., Nueva York, Ed. Foundation Press, 1988, págs. 1132–1153; L.R. BeVier, *Money and Politics: A Perspective on the First Amendment and Campaign Finance Reform,* 73 Cal. L. Rev. 1045 (1985); A.P. Buchsbaum, *Campaign Finance Re-Reform: The Regulation of Independent Political Committees,* 71 Cal. L. Rev. 673 (1983); J.S. Wright, *Money and the Pollution of Politics:*

y en este caso de Puerto Rico, son evitar la corrupción política y mantener la igualdad económica entre los partidos y sus candidatos.

En el caso del próximo referéndum sobre enmiendas a la Constitución del Estado Libre Asociado de Puerto Rico no hay candidatos; los electores no están amarrados a estrictas líneas de partido, ya que es plausible que simpaticen o no con todas o con ciertas de las enmiendas propuestas. La igualdad política se mantiene a través de las disposiciones de la Ley Habilitadora del Referéndum y de los dictámenes de nuestro Tribunal.

La ley asigna fondos a la C.E.E. para que se realice una campaña *informativa* y de orientación *neutral* sobre el contenido de las enmiendas constitucionales propuestas. La C.E.E. tiene que reproducir en los medios de comunicación y en otros medios publicitarios el texto de las enmiendas, ofreciendo igual énfasis y distribuyendo los fondos de manera equitativa entre las tres (3) enmiendas propuestas. Art. 7 de la Ley Habilitadora del Referéndum, *supra*. Como expresáramos anteriormente, este deber de educar abarca el instruir al Pueblo sobre el significado de las enmiendas propuestas y los argumentos que apoyan tanto el votar a favor como el votar en contra de éstas. Ningún partido recibe dinero para la campaña y el Estado está impedido de incurrir en gastos para la compra de tiempo y espacio en los medios de difusión pública, conforme a la interpretación de la Ley Habilitadora del Referéndum y del Art. 8.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3351, que hiciéramos en la Resolución de 8 de septiembre de 1994. Por otra parte, el Art. 8 de la Ley Habilitadora del Referéndum, 16 L.P.R.A. sec. 956g, provee para que los partidos y las agrupaciones de ciudadanos debidamente

---

*Is the First Amendment an Obstacle to Political Equality*, 82 Colum. L. Rev. 609 (1982); *Symposium—Money in Politics: Political Campaign Finance Reform*, 10 Hastings Const. L.Q. 463 (1983); R. Claude y J. Kirchhoff, *The "Free Market" of Ideas, Independent Expenditures, and Influence*, 57 N.D. L. Rev. 337 (1981); J.E. Mueller y J.R. Parrinello, *The Constitutionality of Limits on Ballot Measure Contributions*, N.D. L. Rev. 391 (1981).

inscritos participen en el referéndum.([22]) La ley delega válidamente en los partidos políticos los trabajos de las Juntas de Colegio, Juntas de Unidad Electoral y Comisiones Locales. Concede a las agrupaciones civiles el derecho a participar como observadores, de manera que el principio constitucional de la igualdad electoral está protegido ampliamente.

El asunto crítico en el caso de autos es el que los ciudadanos sean informados y educados adecuada y correctamente sobre las enmiendas constitucionales; que conozcan los argumentos a favor y en contra de éstas; que se interesen en votar, y que acudan a las urnas para dejar saber su sentir. No olvidemos que para que una enmienda forme parte de nuestra Constitución sólo se requiere la ratificación de la mayoría de los votantes. Art. VII, Sec. 1, Const. E.L.A., *supra*. Una participación pobre en el referéndum significa que nuestra Constitución será enmendada por una mera fracción del Pueblo, socavando así uno de los

---

([22]) "Los partidos políticos debidamente inscritos podrán participar en el referéndum, siempre que sus organismos directivos centrales informen a la Comisión Estatal de Elecciones de tal intención dentro de los quince (15) días siguientes a la fecha de vigencia de este Capítulo. Así también, podrán participar como observadores, cualesquiera agrupaciones *bona fide* de ciudadanos siempre que cumplan con los requisitos que a estos efectos disponga la Comisión Estatal de Elecciones mediante reglamentación. La Comisión Estatal de Elecciones dispondrá, mediante reglamento, el nivel de participación que estas agrupaciones tendrán en el proceso del referéndum conforme a lo dispuesto en las secs. 3001 *et seq.* de este título. Las agrupaciones ciudadanas que deseen participar deberán informar a la Comisión Estatal de Elecciones de tal intención dentro de los quince (15) días siguientes a la fecha de vigencia de esta ley. Al notificar su intención de participar en el referéndum, los partidos políticos y las agrupaciones ciudadanas informarán a la Comisión Estatal de Elecciones sobre cuál o cuáles proposiciones de enmienda participarán, y para cada proposición, si lo harán a favor o en contra. Todos los partidos políticos principales que notifiquen a la Comisión Estatal de Elecciones de su intención de participar en el referéndum tendrán el derecho a tener la representación que dispone las secs. 3001 *et seq.* de este título en la Comisión Local, Junta de Unidad Electoral y Junta de Colegio. Si dentro del término aquí establecido ningún partido notifica su intención de participar en el referéndum, la Comisión Estatal de Elecciones, mediante reglamentación, establecerá un procedimiento para otorgarle a algún grupo cívico o político la representación del 'SI' o 'NO' en los colegios de votación el día del referéndum. La Comisión Estatal de Elecciones establecerá, además, el procedimiento para que el día del referéndum cualquier elector pueda representar en su colegio de votación las alternativas del 'SI' o 'NO' o a su partido político si éstos no tienen representación en dicho colegio." Art. 8 (16 L.P.R.A. sec. 956g).

factores que precisamente le da fuerza: el "grado hasta donde sus disposiciones son materia general de acuerdo al tiempo de su adopción". El que los ciudadanos no se motiven a participar en el referéndum y que no conozcan la esencia de los cambios propuestos porque se han limitado las posibilidades reales de expresión de aquellos grupos que interesan llevar un mensaje sobre los temas que están ante el escrutinio público, es lo que verdaderamente nos debe preocupar.

Lo expuesto nos convence de que en el caso de procesos electorales sobre enmiendas a la Constitución no deben mantenerse los límites a las contribuciones debido a que se limitan la sana divulgación de las ideas políticas y restringen las posibilidades de una amplia movilización electoral.

— O —

Opinión disidente del Juez Asociado Señor Negrón García.

I

Las importantes controversias jurídico-constitucionales planteadas en estos recursos —y sus remedios— están inextricablemente atadas a una de naturaleza ética de mayor envergadura. Lamentablemente ésta ha erosionado la raíz que sostiene la confianza ciudadana en el Poder Judicial, esto es, su *neutralidad* como quid pro quo del reclamo legítimo de independencia de los tribunales.

A veces, la mejor cirugía estatutaria mata el remedio; entonces la obra de interpretación del jurista se torna injusta. Así sucede con la decisión mayoritaria suscrita por el Juez Asociado Señor Hernández Denton. Crea un abismo más hondo entre el derecho de los juristas y la conciencia del pueblo. No logra remediar los dos (2) graves defectos constitucionales de la Ley Habilitadora del Referéndum Sobre Enmiendas a la Constitución de Puerto Rico

de 1994, Ley Núm. 49 de 2 de agosto de 1994 (16 L.P.R.A. sec. 956 *et seq.*); por el contrario, revela elocuentemente la inconstitucionalidad de la *resolución* que dos (2) días después —4 de agosto— permitió a los miembros de la Judicatura, bajo el patrocinio mayoritario y la dirección del Juez Presidente Señor Andréu García, oficializar y comenzar, en coordinación con la Oficina de Administración de Tribunales, una campaña proselitista sin precedentes contra una de las propuestas, utilizando jueces, recursos humanos, fondos públicos, facilidades físicas y los tablones de edictos de los tribunales. ¿Puede seriamente sostenerse la opinión mayoritaria de hoy, que se apuntala en el principio del deber de neutralidad? El adjetivo *neutral* significa "[q]ue no es ni de uno ni de otro; que entre dos partes que contienden, *permanece sin inclinarse* a ninguna de ellas". *Diccionario de la Lengua Española*, 20ma ed., Madrid, Ed. Espasa-Calpe, 1984, T. II, pág. 952.

## II

Como demostraremos, la Ley Núm. 49, *supra*, es inconstitucional por carecer de un esquema equitativo de financiamiento *directo* a los partidos políticos y agrupaciones *bona fide*, que no sean meras criaturas, artificios o alter ego de legisladores.[1] Esta innegable realidad ha movido a la mayoría del Tribunal, como alternativa, a interpretar que los fondos asignados por la Legislatura sólo a la Comisión Estatal de Elecciones (en adelante Comisión Estatal) deben ser usados en una campaña *educativa e informativa*

---

[1] Bajo la restrictiva doctrina de legitimación activa promulgada por la mayoría del Tribunal en *Hernández Torres v. Gobernador*, 129 D.P.R. 824 (1992) (impugnación al presupuesto) —reiterada en otros casos— es obvio que el licenciado Báez Galib no podía comparecer *como parte* (Presidente de la agrupación denominada "Movilización Civil") a impugnar la Ley Habilitadora del Referéndum Sobre Enmiendas a la Constitución.

*Quaere* si la condición de Senador por el Partido Popular Democrático (en adelante P.P.D.) del licenciado Báez Galib descualifica esa agrupación para recibir cualesquiera fondos públicos de origen electoral.

para "orientar adecuadamente a la ciudadanía, no sólo sobre la forma de votar y sobre el contenido de las enmiendas, sino sobre su significado y las razones para votar a favor y en contra de cada una de ellas". Opinión mayoritaria, pág. 227.

Sostienen este remedio al concluir que "[t]anto del historial de la Convención Constituyente como de la tradición y experiencia democrática en Estados Unidos y en Puerto Rico, se desprende claramente el *postulado básico* de que en la votación sobre enmiendas constitucionales *existe el deber afirmativo del Estado y de sus organismos de mantener la neutralidad* y de propiciar la más amplia divulgación de información y orientación sobre las razones a favor y en contra de los cambios propuestos". (Énfasis suplido.) Opinión mayoritaria, pág. 229.

Apuntalan su mandato en "que la constitucionalidad de actuaciones del Estado dirigidas a informar a la ciudadanía sobre las opciones que tiene ante sí en un evento electoral como el del presente caso, incluso el exponer las razones para votar a favor y en contra de las distintas iniciativas, ha sido sostenida *siempre que esta labor se realice de manera neutral. Stanson v. Mott*, 551 P.2d 1, 10–13 (Cal. 1976); *Citizens to Protect Pub. Funds v. Board of Education*, 98 A.2d 673 (1953). Lo que *el Estado no puede hacer es violar su deber de neutralidad y emprender campaña, directa o indirectamente, en relación con el asunto sometido al pueblo en el evento electoral*, ello por virtud de la Primera Enmienda de la Constitución federal y de la Sec. 2 del Art. II de la Constitución del Estado Libre Asociado L.P.R.A., Tomo 1". (Énfasis suplido.) Opinión mayoritaria, pág. 231.

Para lograr ese *"deber de neutralidad"*, la mayoría ha decidido que en la campaña educativa la "Comisión Estatal deberá gastar cantidades iguales para la divulgación de las razones a favor y en contra de cada una de las enmiendas propuestas ...". Opinión mayoritaria, pág. 230.

Varios fundamentos de peso nos mueven a disentir.

*Primero*, ¿cómo puede la mayoría del Tribunal sostener que existe "un deber de neutralidad del Estado" si mediante su Resolución de 4 de agosto de 1994 (MC-94-21), *In re V. Limit. Const., Éticas Judicatura*, 136 D.P.R. 693 (1994), autorizó a los jueces del país a involucrarse oficialmente en una campaña político-partidista *contra* la propuesta enmienda constitucional que atañe, precisamente a este Foro? ¿Es que el Poder Judicial no forma parte del Estado?

*Segundo*, desde que la mayoría del Tribunal emitió esa resolución, por conducto y bajo la dirección y supervisión del Juez Presidente Señor Andréu García, se inició y se ha llevado a cabo un plan concertado y con calendario de campaña proselitista oficial, *in crescendo*, en que tanto el Juez Presidente, algunos de sus subalternos y jueces de instancia, han comparecido ante la prensa, radio, televisión, reuniones, tertulias, debates, asambleas, asociaciones y clubes cívicos —incluso dentro de las facilidades físicas que albergan los tribunales— a promover la *postura* mayoritaria de que el electorado vote *contra* la enmienda a la composición del Tribunal. El reclutamiento de esos jueces se ha logrado bajo el predicado de que existe un "deber cívico afirmativo" de educar y defender la independencia judicial.

Como indicamos al disentir de esa resolución:

> ¿Qué clase de educación cívica-informativa es aquélla que sólo expone un (1) punto de vista: en contra?
>
> Esta implicación destruye la esencia del *Poder Judicial* y el factor de *neutralidad* en el cual se apuntala todo reclamo de independencia, elemento indispensable para que se respeten los dictámenes de los jueces. Debilita irremediablemente la imagen de imparcialidad de este Tribunal, de los jueces del Circuito de Apelaciones y del Tribunal de Primera Instancia. (Énfasis suplido y en el original.) *In re V. Limit. Const., Éticas Judicatura*, supra, pág. 705.

A renglón seguido añadimos:

> Lo expuesto queda agravado ante el anuncio del P.I.P. y del

Senador del P.P.D., Lcdo. Eudaldo Báez Galib, en cuanto a que impugnarán en los tribunales la constitucionalidad del Referéndum. ¿Podemos reclamar imparcialidad y objetividad si la posición *oficial* del Tribunal Supremo y de la alta dirección administrativa es activamente contraria a una de las enmiendas propuestas en el Referéndum?

Involucrar a los jueces en esa contienda partidista exacerba innecesariamente las naturales zonas de fricción existentes entre los poderes constitucionales. *Una vez los jueces entren en la palestra pública política, no hay forma de evitar que sean blanco inexorable de los ataques y vejámenes personales que lamentablemente generan este tipo de controversias partidistas apasionadas.* (Enfasis suplido y en el original.) *In re V. Limit. Const., Éticas Judicatura,* supra, págs. 705–706.

*Tercero,* es un absurdo jurídico la opinión mayoritaria *que se apuntala en exigir la neutralidad al Estado y, por otro lado, permite desarrollar al Poder Judicial una campaña oficial de carácter político-partidista carente de toda neutralidad, utilizando como instrumentos a algunos de sus jueces y funcionarios administrativos.* Semejante apología de la independencia judicial es un *contrasentido* que, "[l]ejos de avanzarla, la retrasa y anquilosa, a la vez que coloca a los jueces en una impermisible relación simbiótica de *Juez-Político* con las otras dos (2) ramas políticas". (Énfasis en el original.) *In re V. Limit. Const., Éticas Judicatura,* supra, pág. 706.

Y es que "[n]i la Constitución ni los Cánones de Ética Judicial visualizan excepciones a la prohibición de que los jueces se involucren pública y activamente en una campaña de ribetes político-partidistas, fundadas en que la enmienda constitucional que ha de someterse al electorado trate sobre alguna disposición del Art. V nuestra Constitución, *supra,* o que el Juez Presidente o este Tribunal unánimemente estén en contra". *In re V. Limit. Const., Éticas Judicatura,* supra, pág. 704.

No puede validarse un patrón de participación repetido y continuo de la Judicatura puertorriqueña bajo el manto de que simplemente se trata de una campaña educativa de carácter informativo-cívico. "Es ilusorio pensar que esa

'educación' por *Jueces-Políticos* pueda lograrse adelantando un solo punto de vista; ello es contrario a los principios pedagógicos elementales. Ni el Juez Presidente, como tampoco ningún miembro de este Tribunal —con carácter institucional o individual— puede así autorizarlo o establecer dispensas vía regla o interpretación." (Énfasis en el original y escolio omitido.) *In re V. Limit. Const., Éticas Judicatura*, supra, pág. 704.

Y *cuarto*, resulta una nota irónica que *ahora* la mayoría del Tribunal adelante una tesis de neutralidad constitucional para justificar el desembolso de fondos públicos y, a la par, haya permitido que continúe una campaña oficial *contra* una de las propuestas. Si el principio de salvaguarda de neutralidad, al decir mayoritario, es "un postulado básico", ¿puede infringirlo impunemente el Poder Judicial? ¿Cómo usar esa doble vara? Hoy más que nunca insistimos en que "[l]a *fragmentación y laxitud ética que presupone la resolución mayoritaria es ilógica y contradictoria. No se puede servir simultáneamente en dos (2) vocaciones: Juez-Político. El principio de imparcialidad y neutralidad de la Judicatura —nervio de nuestras instituciones democráticas— no admite que al servicio de una se inmole la otra*". (Énfasis en el original.) *In re V. Limit. Const., Éticas Judicatura*, supra, pág. 713.

## III

Reafirmamos que esa postura *"vicia la pureza del proceso electoral y arroja dudas sobre la legitimidad de los resultados adversos de esa enmienda particular"*. (Énfasis en el original.) *In re V. Limit. Const., Éticas Judicatura*, supra, pág. 710.

*Por estas razones, la campaña oficial del Poder Judicial contra una de las propuestas, independientemente del defecto constitucional de la tercera propuesta y la ausencia de*

*un financiamiento directo a los partidos políticos, ha viciado de antemano de nulidad radical el referéndum.*

Nuevamente preguntamos:

En buena doctrina y práctica constitucional, ¿se puede ser parte y juez? "La independencia institucional del Poder Judicial deriva inexcusablemente de la esencia de su función: determinar el Derecho y atribuir derechos. Teniendo ésta como base el conocimiento, que no tolera mandatos —*porque nunca podría convertir lo falso en verdadero, ni al contrario*— *su independencia brota como exigencia lógica, al margen de cualquier contingencia política.*" (Énfasis suplido.) V. Comeiro, citado por R. de Marino, *La independencia de los tribunales, garantía de su función*, 1988 Rev. Der. Proc. 431, 437 (1988).

La mayoría del Tribunal no puede promulgar una filosofía político-partidista, aun para combatir un cambio a una de las disposiciones del Poder Judicial expuestas en el Art. V de nuestra Constitución, *supra. Se trata de un asunto que pertenece a las ramas políticas. No podemos fomentar, mucho menos oficializar, que los jueces se conviertan en proselitistas, como tampoco permitir que asuman la defensa de posturas en contrario.*

La mayoría del Tribunal da la espalda a la letra y el espíritu de la Constitución, a los Cánones de Ética Judicial e ignora totalmente la buena tradición democrática. *Como resultado, la Rama Judicial ha establecido un cuarto partido político, no inscrito.* Una vez culmine el evento electoral del referéndum, ¿cómo podremos retirar el banderín de postura oficial para enarbolar el estandarte de la fiel balanza, recuperar la confianza ciudadana perdida y pretender que se nos crean y respeten nuestras decisiones?

Históricamente la toga se tiñe de negro, en función de neutralidad político-partidista, ecuanimidad, prudencia y sobriedad. No hay derecho a teñir en forma distinta la toga judicial y después calificar su color como oficial. Tampoco se puede permitir que cada juez haga con su toga lo propio, según le plazca.

Nuestro actual diseño constitucional no permite al Tribunal Supremo reclamar los poderes que la Constitución no le da; menos, oficializar y promover campañas impregnadas y de un claro contenido político-partidista.

"Al igual que en los tiempos de Rousseau y Montesquieu, la división de funciones públicas entre los Poderes Ejecutivo, Legislativo y Judicial, *sigue siendo el mejor antídoto contra la tiranía de uno solo.*

*La más preciada fuente de autoridad está en la fuerza per-*

*suasiva inherente de nuestros fundamentos y nuestras decisiones.* En la medida en que *vía interpretación o reglamento* recurramos al artificio, el sofisma, al fingimiento, destrozamos el fundamento del alto sitial de este Foro, trabajo de muchas generaciones que nos precedieron y del cual todos somos *celosos custodios.* Somos testigos de un esquema reglamentario *simbiótico —Jueces[-Políticos]—* que excede lo racionalmente tolerable. ¡Y lo peor de todo, convirtiendo a la mayoría de este Tribunal en *juez y parte* de la *in*constitucionalidad de sus *propios actos*! (Énfasis en el original.) *Regl. Creac. y Func. Unidad Esp. J. Apel.,* 134 D.P.R. 670, 715–716 (1993), opinión disidente.([7])

([7]) "Descargamos la tarea anticipando la crítica seria, honesta y responsable. También aceptamos la injusta, producto de lo volátil del asunto y del apasionamiento de mentes fanáticas, cerradas o prejuiciadas. *Estamos acostumbrados.* Como jurisprudentes siempre tratamos de desentrañar la *verdad jurídica objetiva,* misión que en una sociedad civilizada es una de las formas más elevadas de manifestar nuestro respeto hacia la dignidad humana. 'No disfrutamos de un exceso de instituciones dedicadas a la búsqueda racional de la verdad ... los jueces están entrenados para abrocharse sus abrigos y resistir las ventiscas de la propaganda, no importa la dirección en que éstas soplen'. (Traducción nuestra.) P.A. Freund, *The Supreme Court of the United States,* Nueva York, MacMillan Co., 1961, págs. 189–190." (Énfasis en el orginal.) *Gierbolini Rodríguez v. Gobernador,* supra, páge. 412, opinión disidente. (Énfasis suplido y en el original.) *In re V. Limit. Const., Éticas Judicatura,* supra, págs. 714–716.

## IV

Más allá de la cuestión ética y la fragilidad del argumento de neutralidad esbozado por la mayoría, concentrémonos en el aspecto del financiamiento.

En esa tarea, como trasfondo conceptual mínimo, hemos de reconocer que nuestra Constitución no es más grande que el Pueblo que la creó; que la voluntad de generaciones pasadas allí plasmadas no es ni puede erigirse dogma inquebrantable y vinculante de las generaciones futuras, independientemente de los cambios que ameriten las distin-

tas circunstancias y necesidades del Pueblo; que como documento instrumental, su vitalidad se anquilosaría y fosilizaría si hiciéramos virtualmente imposible enmendarla, y que concebiblemente siempre podría argüirse la existencia de un principio constitucional de superior jerarquía que impediría cualquier cambio. Lo contrario atentaría contra el principio supremo que insufla vida a la misma Constitución, esto es, recoger la voluntad del Soberano, que no es otro que el Pueblo.

Estos conceptos, sin embargo, no son excusa para que dejemos de analizar y adjudicar, con el rigor jurídico necesario, la validez de la Ley Núm. 49, *supra*. Ésta encomienda a la Comisión Estatal implantar y desarrollar una "campaña de información y orientación". Art. 7 (16 L.P.R.A. sec. 956f). *Expresamente prohíbe* que los fondos asignados sean usados por los partidos políticos, grupos o individuos. En resumen, *en el diseño legislativo el único recipiente de fondos es la Comisión Estatal.*

Además, dicha ley impone unos límites a las contribuciones que las personas naturales y jurídicas pueden hacer a los partidos políticos u otras organizaciones. Art. 19 (16 L.P.R.A. sec. 956r).[2]

Del conjunto armonioso de estas disposiciones surge la evidente realidad de que por un lado la Asamblea Legislativa —más allá de los doscientos mil dólares ($200,000) regulares anuales provistos en el Fondo Electoral— no asignó nada a los partidos políticos para llevar a cabo sus campañas de información y orientación, y, por otro, les fijó un tope que restringió sustancial y significativamente la posibilidad de recibir aportaciones de dinero para desarrollar unas campañas efectivas.

Vemos, pues, que el esquema de la Ley Núm. 49, *supra*, impone *exclusivamente* a la Comisión Estatal la enco-

---

[2] En lo pertinente, la "cantidad de mil (1,000) dólares por cada una de las propuestas de enmiendas a la Constitución, para un máximo de tres mil (3,000) dólares". Art. 19 (16 L.P.R.A. sec. 956r).

mienda de "informar y orientar" de manera neutral al electorado puertorriqueño sobre "el contenido de las enmiendas a la Constitución que se someten a votación, la forma en que marcarán su papeleta para consignar en ella su voto, y para exhortar al electorado a que se inscriba y participe en la votación". Adhiriéndose a una apreciación gramatical, la Comisión Estatal aduce que la campaña es neutral y se limita a *difundir las propuestas de enmienda y urgir a los electores a inscribirse y a votar.*

En esa visión y la interpretación mayoritaria contraria a la intención legislativa es precisamente donde radica el problema. Veamos. Como premisa rectora, no podemos perder de vista que, *intrínsecamente*, cualquier modificación a la Constitución implica que el electorado tendrá de frente todo el ente gubernamental que mueve su maquinaria y sus recursos, promoviendo *siempre* una respuesta *afirmativa* (Sí). Dicho de otro modo, por su naturaleza, cada vez que los poderes políticos del Estado proponen alguna enmienda constitucional, buscan la ruptura del statu quo para propulsar un cambio al diseño constitucional vigente. *La sola iniciativa del Estado al proponer unas enmiendas constitucionales implica una invitación al cambio; esto es, calladamente, pero a gritos, proclama un Sí.*

Tradicionalmente, en nuestro medio ambiente, los partidos políticos son los organismos idóneos llamados a explicar las repercusiones de un voto a favor o en contra de determinada medida propuesta. Bajo esta dinámica, normalmente, en la medida en que la campaña oficial de la Comisión Estatal se circunscribe a los aspectos limitados de difundir las propuestas y urgir a los electores a inscribirse y votar, éstos tienen que descansar en los partidos políticos para conocer, desde sus variadas posiciones o ideologías, las razones, el alcance y las consecuencias de un voto afirmativo o negativo. Ciertamente, siendo la Comisión Estatal una entidad gubernamental, sus mensajes al respecto tienen un imprimátur oficialista; por su origen

no emerge como el organismo idóneo para ir más allá y divulgar todas las virtudes o defectos que las propuestas enmiendas pudiesen tener.

Lo expuesto revela un hecho crucial: *la falta de neutralidad inherente que conlleva iniciar el proceso de enmendar la Constitución.* A su vez, pone de manifiesto la verdadera razón por la cual la Asamblea Legislativa impuso esas limitaciones a la Comisión Estatal en el uso de los fondos. Aunque sin fondos adicionales, dejó a los partidos políticos la función tradicional; a fin de cuentas:

> *Los partidos políticos son elemento básico de toda democracia. Son las vías mediante las cuales se canalizan pacíficamente las distintas tendencias políticas y económicas de la sociedad en un momento dado.* Los partidos políticos realizan funciones *cuasigubernamentales*, tales como formular programas de administración y proponer candidatos a puestos políticos. *El desempeño de estas funciones es indispensable para el sistema político.* Es por ello que se justifica, por perseguir un fin público, la asignación de fondos públicos para financiar primarias y otras actividades propias de las funciones de los partidos puertorriqueños *bona fide.* (Énfasis suplido y en el original, y citas omitidas.) *P.S.P. v. E.L.A.,* 107 D.P.R. 590, 610 (1978).

El análisis que precede nos lleva a recordar que, en atención a la reconocida función cuasipública de los partidos políticos, es imperativo salvaguardar el principio de igualdad económica electoral *inmerso* en nuestra Constitución. Como corolario inexorable de este principio, la Asamblea Legislativa creó el Fondo Electoral cuya naturaleza, según explicada en *P.N.P. v. Tribunal Electoral,* 104 D.P.R. 741, 750–752 (1976), respondió a conceder a los partidos políticos "una capacidad económica inicial e igualitaria para la divulgación de ideas y mensajes en nuestro país".

Vemos, pues, que la determinación de la actual Asamblea Legislativa de no asignar fondos a los partidos políticos para este referéndum —en cierto modo pretendiendo así equipararlos económicamente— no es otra cosa que

*una igualdad ilusoria que ignora la necesidad de esa capacidad económica inicial y no satisface el principio de igualdad.* Como explicáramos, el solo hecho del Estado presentar a la ciudadanía una propuesta enmienda a la Constitución da al partido político en el poder la ventaja que genera su promulgación en términos de un voto en la afirmativa ante el electorado. *Consecuencia inescapable: el Estado viene obligado a proveer aquellos fondos adicionales que razonablemente permita a los partidos políticos orientar y educar a los electores desde sus diversas perspectivas.*

Esa obligación no se satisface con el Fondo Electoral regular para los años no electorales. Ciertamente resultan insuficientes para sufragar los gastos extraordinarios que un evento electoral de esta naturaleza conlleva. Aunque la Ley Electoral de Puerto Rico permite su desembolso en referendos, ello significa que no está vedado usarlos para consultas de este tipo. No implica que esas cantidades sean suficientes para cubrir los gastos inmanentes a consultas extraordinarias y trascendentales de este género.

Por su importancia pública —y para mantener la salud de nuestra democracia— es de esperarse que estos procesos generen un interés ciudadano, la movilización de los partidos políticos y el inusual desembolso de fondos considerablemente mayores a los gastos ordinarios en los años no electorales. *Este desembolso es esencial para la igualdad económica electoral.* Es extensivo el mismo razonamiento que hace unos días —8 de septiembre— nos llevó a aplicar a *este* referéndum la prohibición de anuncios gubernamentales. Si hemos de verdaderamente atemperar la campaña oficialista de la Comisión Estatal, es necesario asignar unos fondos a los partidos políticos para que informen al electorado sus pareceres sobre las enmiendas. *La omisión legislativa de asignar esos fondos infringe el principio de la igual protección de las leyes y pone también en*

*jaque la legitimidad de los resultados del referéndum. Debimos paralizar para que la Asamblea Legislativa actuara.* Lo aquí esbozado responde y evidencia la naturaleza político-partidista del proceso del referéndum.(³)

---

(³) Desde el primer incidente procesal de 2 de septiembre de 1994, constatamos la naturaleza político-partidista de las propuestas. El P.P.D. adujo que el Art. 8.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3351, impedía al Gobierno difundir anuncios de propaganda en año electoral. Los demandados argumentaron que sólo aplicaba en el contexto de elecciones generales, no en referendos, y que era de naturaleza cívico-social. Invocaron la resolución del Tribunal en *Regl. Creac. y Func. Unidad Esp. J. Apel.*, 134 D.P.R. 670 (1993). La mayoría del Tribunal, mediante resolución, devolvió la controversia al Tribunal Superior. En nuestro disenso, expresamos que no cabía hacer distinciones entre elecciones generales y referendos, pues en ambos se ejercitaba el sufragio electoral, el cual tenía que ser libre de coacción. Señalamos, además, que la prohibición estaba fundada en el principio de igualdad electoral y en el juego justo electoral, reproduciendo así nuestra expresiones disidentes de *Gierbolini Rodríguez v. Gobernador*, 129 D.P.R. 402 (1991).

En *Gierbolini Rodríguez v. Gobernador*, supra, la mayoría, tras una hermética y restrictiva aplicación de las técnicas procesalistas de justiciabilidad, entendió que no tenía jurisdicción para expresarse en los méritos. *El efecto práctico fue que el Gobierno de entonces, dominado por el P.P.D., desató una masiva y costosa campaña publicitaria con miras al referéndum de ese año.*

Oportunamente, el asunto regresó a este Foro. En *P.P.D. v. Gobernador I*, 136 D.P.R. 861 (1994), mediante *per curiam*, finalmente el Tribunal reconoció que aplicaba dicha prohibición, adoptando implícitamente la esencia de los fundamentos de nuestra opinión disidente de *Gierbolini Rodríguez v. Gobernador*, supra.

Al respecto, se decidió que el derecho del pueblo al sufragio universal —libre de coacción— y el principio de igualdad económica electoral hacían imperativo su aplicación a los referendos, igual que a las elecciones generales.

Distinto a como lo hicieron en el contexto de la campaña llevada a cabo por jueces —en que la mayoría expresó que la prohibición constitucional y ética se limitaba a las elecciones generales, no, así, a referéndums— en el contexto de la prohibición de anuncios señaló que se extendía también a referendos. De ese modo, *en este referéndum* se acalló la campaña oficialista del Gobierno que pudiera tener el efecto de coaccionar la voluntad de los electores en cuanto a las propuestas enmiendas, incluso la del número de Jueces de este Foro.

En esa opinión *per curiam,* la mayoría al fin reconoció que este referéndum era un asunto político-partidista.

El zigzagueante proceder mayoritario provee interesante material a los estudiosos de Ciencias Políticas, quienes podrían tratar de brindarnos respuestas racionales y razonables a preguntas, tales como: ¿en qué momento una campaña cívica se torna político-partidista?; ¿puede un mismo evento ser cívico si quienes participan son jueces que alegadamente luchan por su "independencia judicial", pero político-partidista si quienes participan son miembros de las Ramas Ejecutiva y Legislativa?

# V

Advertimos lo defectuoso y trunco del remedio mayoritario que ordena que de los fondos asignados a la Comisión Estatal participen sus Comisionados Electorales, en unión al Presidente, en actuaciones conjuntas de carácter institucional, exponiendo los pro y contra de cada propuesta enmienda. Que cada Comisionado Electoral o su alterno, junto a los demás, pueda expresar sus puntos de vista sobre ambas propuestas no es suficiente ni supera los visos de inconstitucionalidad. La mayoría del Tribunal incurre en el pecado original contenido en el Art. 7 de la Ley Núm. 49, *supra*, de que "[a]l divulgar el contenido de las enmiendas constitucionales propuestas en el referéndum, la Comisión Estatal de Elecciones dará igual énfasis y distribuirá sus fondos por igual entre las tres (3) enmiendas propuestas".

De dicho precepto legal surge una limitación y restricción a la forma en que los Comisionados Electorales pueden usar el dinero para la campaña de orientación y educación: se les impone la obligación de invertir *igual cantidad de dinero en cada propuesta*. Dicho precepto resulta particularmente gravoso para el P.P.D., que ha manifestado no tener posición fija sobre la propuesta al derecho a la fianza y, aún así, por imperativo del remedio mayoritario, tiene que tolerar el desembolso igualitario de las propuestas, careciendo de la libertad para concentrar en la relacionada con la composición del Tribunal Supremo, respecto a la cual adoptó una firme y clara posición en contrario.

Ese remedio vulnera el derecho a la expresión de los miembros de los partidos políticos y les impone monumentales obstáculos para escoger las estrategias y técnicas de propaganda y comunicación que entiendan más eficaces para orientar y educar al electorado, incluso la selección de aquellos que sirvan mejor de emisores (sólo pueden ser los

Comisionados Electorales y los alternos); diseminar mensajes separadamente del órgano oficialista; destinar una mayor proporción de la cantidad de dinero disponible para así recabar mayor atención de la audiencia respecto a unos puntos particulares.

*Además, el esquema ideado por la mayoría es un tanto utópico. Conlleva ínsitamente que subsista el potencial de las naturales, pero irreconciliables diferencias entre los miembros de la Comisión Estatal, que los obligaría ineluctablemente a zanjarlas eventualmente ante el Tribunal Superior y luego ante este Foro. Fungiríamos como censor de los anuncios y propaganda impugnada.* Elaboremos esto.

La solución mayoritaria estriba en colocar en manos de la Comisión Estatal —con la participación activa de los Comisionados Electorales de los distintos partidos— una campaña neutral de orientación y educación. Ello presupone que puedan ponerse de acuerdo sobre el contenido, la forma y el tono de cada anuncio, teniendo en cuenta que representan institucionalmente a la Comisión Estatal. Ilustrémonos inicialmente con la propuesta relativa a la fianza. ¿Podría, por un lado, el Comisionado Electoral del Partido Nuevo Progresista, al "orientar" sobre la necesidad de votar a *favor*, hacer hincapié en que sería un instrumento poderoso en la lucha contra el crimen?; por otro, como técnica de "orientación y educación", y desde su perspectiva sociohistórica, ¿podría el Comisionado del Partido Independentista Puertorriqueño instar a votar en *contra* para evitar que, como en antaño, puedan castigarse a los disidentes políticos separatistas con encarcelamiento sin derecho a fianza? Teóricamente se trata de dos (2) legítimas visiones de "educación", pero ¿lograría consenso?

La situación se agrava en el caso de la propuesta sobre el aumento de Jueces de este Foro. ¿Podría, por un lado, el Comisionado del P.N.P. "orientar y educar" al electorado sobre su necesidad reclamando validez a la tesis de desbalance ideológico y alegado Tribunal Supremo parcializado?

¿Insistir que ello atenta contra la adjudicación imparcial de casos? ¿Que dicho aumento aligeraría la solución de casos? En contra, el Comisionado del P.P.D., ¿podría enfocar su campaña educativa en el factor de que el pretendido balance ideológico del Tribunal es un atentado y una afrenta a la independencia judicial por estar motivado por simples consideraciones político-partidistas? ¿Argüir que su potencial de funcionamiento en tres (3) salas erosionaría la estabilidad y consistencia doctrinal?

Asumiendo que no se llegase a un consenso respecto a estas posiciones, ¿no sería en última instancia este Tribunal quien tendría que pasar juicio, *a título de censor*, sobre el contenido, la forma y el estilo de los anuncios para ver si cumplen con la *neutralidad* requerida a todos los componentes del Estado?

No es prudente que sea este Tribunal el llamado a intervenir en esa capacidad, máxime cuando públicamente ha validado una campaña oficial *contra* el aumento de número de Jueces.

Estos problemas a modo ejemplificativo —nunca podremos agotar la lista de variadas y diversas posibilidades que la fecunda realidad o imaginación ofrece— apuntan hacia la imperiosa necesidad de brindar a los partidos políticos los fondos necesarios para que sean éstos los que lleven a cabo su natural función propagandista, ganar adeptos, educar y orientar al pueblo en eventos electorales. Lejos de avanzar la democracia, la decisión mayoritaria innecesariamente obstaculiza y pone graves cortapisas a la libertad de expresión de los miembros de los partidos políticos.

No importa la teoría que endosemos —modelo del libre mercado de ideas, modelo del proceso democrático, modelo de libertad o modelo de tolerancia— promover el desarrollo saludable en una sociedad democrática implica aceptar, como inevitable, el derecho de toda persona —familiares, amigos, vecinos, compañeros de trabajo y desconocidos— de toda tendencia ideológica (independentista, autonomista, estadista, comunista,

anarquista, socialista, etc.), a manifestar un criterio distinto y antagónico del nuestro, a tener de nosotros una buena o mala opinión, a criticarnos ideológicamente, a percibir distorsionada o perniciosamente nuestro comportamiento y nuestras creencias, en fin, a juzgarnos severa o intolerantemente, alejados del mandamiento puro de amar al prójimo. Nuestras opiniones y las de ese prójimo, sean o no prejuiciadas, no pueden ser objeto de control gubernamental. Ello atentaría contra la naturaleza humana y sofocaría el libre pensamiento y la expresión. *Noriega v. Gobernador*, 130 D.P.R. 919, 925 (1992).

## VI

Las dificultades expuestas de la Ley Núm. 49, *supra*, evidentemente inciden en los aspectos medulares que le insuflan vida; su inconstitucionalidad no puede ser superada recurriendo la mayoría del Tribunal a la cláusula de separabilidad de su Art. 27 (16 L.P.R.A. sec. 956 n.).[4]

*Primeramente*, la propuesta enmienda a limitar varios cargos electivos no es separable del peculiar esquema de asignación de fondos fijados en la propia ley. Y *segundo*, la doctrina de separabilidad no es susceptible de invocarse ni aplicarse al defecto de no asignarles fondos adicionales a los partidos políticos. Veamos.

La fórmula que nos brinda la doctrina de separabilidad para adjudicar si un estatuto es parcial o totalmente inválido se proyecta en dos (2) aspectos: *objetivo y subjetivo*, los cuales tienen que ser satisfechos. El *objetivo* requiere que la ley sea, de hecho, capaz de ser separada; significa que la separación no resulte en un estatuto hueco e ininteligible. En la situación ante nos, la separación de la tercera propuesta de enmienda es objetivamente separable; o sea, la Ley Núm. 49, *supra*, no pierde todo sentido al declararse parcialmente inconstitucional.

---

[4] Dispone:

"Si cualquier parte, inciso o artículo de esta ley fuera declarada inconstitucional por tribunal competente, la sentencia a tal efecto dictada se limitará a la parte, inciso o artículo declarado inconstitucional, y no afectará ni invalidará el resto de las disposiciones de esta ley." Art. 27 (16 L.P.R.A. sec. 956 n.).

En su aspecto *subjetivo*, debemos determinar "lo que la Legislatura hubiera hecho de haber sabido que ciertas disposiciones del estatuto, según fué originalmente aprobado, eran inválidas". *Tugwell, Gobernador v. Corte*, 64 D.P.R. 220, 230 (1944). Esta conjetura judicial, en términos de lógica, es una proposición condicional hipotética, cuyo rasgo más notable es que no puede ser contestada terminantemente. Por ende, el aspecto *subjetivo* requiere que adivinemos lo que hubiese sido la intención legislativa. Ello no significa que este ejercicio conjetural sea impropio; la misma existencia del Art. 27, *supra*, nos indica implícitamente que la Asamblea Legislativa tenía, por lo menos, la intención de que los tribunales enfrentásemos estos problemas de interpretación. Sí quiere decir que, al conjeturar, debemos hacerlo con sumo cuidado y circunspección.

Al aplicar la fórmula en su aspecto *subjetivo*, la jurisprudencia ha establecido algunas conjeturas preliminares acerca de la intención legislativa suficientemente confiables como para convertirse en presunciones. Así, " '[e]n ausencia de ... una ... [cláusula de separabilidad], la presunción es que la Legislatura tuvo en mente que la ley fuera efectiva en su totalidad ...". *Tugwell, Gobernador v. Corte*, supra, pág. 228. Similarmente, pero al contrario, se presume la separabilidad cuando el estatuto la contiene, pues, claro está, hay pocas indicaciones de intención legislativa mejores que el mismo texto estatutario.

Ahora bien, la aplicación ciega o mecánica de estas presunciones pueden llevarnos a conclusiones erróneas. Recordemos que meramente recogen unas reglas generales de sentido común, no infalibles. Su utilidad es que nos ahorran el tiempo y esfuerzo que incurriríamos de tener que siempre investigar a fondo la intención legislativa. Estas economías se pierden si hay razones para cuestionar la validez de las presunciones.

La cláusula de separabilidad de la Ley Núm. 49, *supra*, normalmente activaría la presunción de separabilidad. A

primera vista, la eliminación de una de las tres (3) propuestas no hiere mortalmente el estatuto habilitador, ya que cada propuesta enmienda parece ser independiente de las otras. Por lo tanto, la que persigue limitar los términos de unos cargos electivos, probablemente sería separable por sí sola. Esta conclusión, aparentemente razonable, es la que adopta la mayoría.

*A poco que reflexionemos, hemos de percatarnos que estamos ante una aplicación mecánica y ciega de la aludida presunción de separabilidad.* La opinión mayoritaria, sin fundamentos, utiliza un lenguaje sumamente *concluyente*: únicamente dicen que del texto del Art. 27 de la Ley Núm. 49, *supra*, "claramente se desprende que el estatuto debe mantenerse en vigor aun después de eliminados los incisos relacionados con la proposición de enmienda para añadir la Sec. 20 al Art. VI de la Constitución, *supra*. Nada indica que se debe ignorar este mandato legislativo en el caso de autos." Opinión mayoritaria, pág. 224. Debemos precavernos cuando se nos afirma que algo se desprende tan "claramente" que no requiere explicación; si es tan claro, ¿qué costaría explicarlo?

*Efectivamente, al estudiar con más detenimiento la Ley Núm. 49, supra, detectamos un problema de interpretación serio e insuperable en la asignación de fondos a la Comisión Estatal para su campaña de información y orientación.* Su Art. 26 (16 L.P.R.A. sec. 956 n.) dispone dos millones trescientos mil dólares ($2,300,000) "[p]ara los gastos de la campaña de información y orientación dispuesto en el Artículo 7 de esta ley." La raíz del problema es que la intención de la Asamblea Legislativa fue, *originalmente*, obligar el uso de esos fondos para orientar al electorado respecto a las *tres (3) propuestas, no sólo dos (2)*. El efecto inmediato del decreto de inconstitucionalidad de la propuesta sobre los límites de términos a ciertos cargos electivos es la mayoría del Tribunal *está aumentando sustancialmente los fondos disponibles para las dos (2) pro-*

*puestas restantes.* Esta consecuencia, aparentemente no prevista, *es una invasión impermisible a la exclusiva pre-rrogativa legislativa —de origen constitucional— de asignar los fondos públicos.* Se trata de un principio fundamental en nuestro esquema constitucional de separación de poderes, enmarcado en la Sec. 9 del Art. VI de nuestra Constitución, L.P.R.A., Tomo 1, ed. 1982, pág. 369, la cual dispone:

> Sólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, *y en todo caso por autoridad de ley.* (Énfasis suplido.)

Es inaceptable que este Tribunal —a título de Superlegislatura— decida qué se hará con los fondos originalmente destinados a orientar al público sobre la limitación de términos. *Se trata de una decisión que corresponde sólo a la Legislatura y trasciende nuestra autoridad. P.I.P. v. C.E.E.,* 120 D.P.R. 580 (1988); *P.S.P. v. E.L.A.,* 107 D.P.R. 590 (1978).

La intromisión del Tribunal en esta área no es simplemente un problema matemático. Tampoco es solución reducir los $2.3 millones por un tercio. Adviértase que el Art. 7 de la Ley Núm. 49, *supra,* contiene un lenguaje que establece una división *tripartita* de fondos, esto es, "la Comisión Estatal de Elecciones dará igual énfasis y distribuirá sus fondos por igual entre las tres (3) enmiendas propuestas". De éste y otros artículos podemos concluir que uno de los propósitos cardinales de la ley fue *la igualdad de trato entre las propuestas.* No es materia susceptible de adivinanza judicial, por no decir imposible, especular ahora lo que la Asamblea Legislativa hubiese querido que hiciéramos con los fondos restantes. *No hay forma de separar la propuesta inconstitucional sin lesionar un objetivo legislativo primordial: la ley debe considerarse enteramente nula.*

No olvidemos que " '[n]o es función de este [T]ribunal

corregir las deficiencias que encuentre en la legislación sometida a su estudio e interpretación. Lo único que podemos hacer es señalar esas deficiencias, para que ellas sean corregidas por el Poder Legislativo' ". *Noriega v. Hernández Colón*, 135 D.P.R. 406, 468 (1994).

Independientemente de la separabilidad de la tercera propuesta enmienda, la cláusula de separabilidad jamás podría subsanar la inconstitucionalidad dimanante de la *omisión* de asignar fondos adicionales para las campañas de los partidos políticos. *Una cláusula de separabilidad es, esencialmente, un permiso adelantado de la Asamblea Legislativa a los tribunales para que extirpen las faltas constitucionales de los estatutos. Lógicamente no tiene sentido hablar de extirpación cuando la falla constitucional recae en una omisión; no podemos eliminar lo que no está. La única forma de subsanar un estatuto cuando su defecto se debe a la ausencia de requisitos constitucionales es añadirlos; o sea, legislar.*

## VII

Para terminar, una vez más "reconocemos las discusiones intelectuales, jurídicas y políticas —serias, histéricas y apasionadas— que generan controversias de esta índole. Como Tribunal colegiado nuestros fallos no están inmunes a la crítica, sea constructiva, sana, injusta o viciosa. No lo pretendemos, y por el contrario, resulta saludable ya que el poder que ejercemos no es privativo sino público. La disposición final de ciertos casos, aunque urgente, requiere una serena reflexión, un ponderado juicio y sobre todo libertad de conciencia judicial. Por ello, merece recordarse que '[c]uando un caso termina, los tribunales están sujetos a las mismas críticas que otras personas; pero no se puede negar la necesidad de evitar interferencia con el curso de la justicia, debido a expresiones prematuras, argumentos o intimidación.' Holmes, O. W.: *Paterson v. Colorado ex rel.*

*Atty. Gen.*, 205 U.S. 454, 463 (1907)". *P.S.P. v. E.L.A.*, supra, págs. 629–630.

Como presagiamos en nuestro disentir, la Judicatura en general ha tenido que pagar un precio alto por involucrarse extrajudicialmente en una controversia de índole político-partidista. A estas alturas, ha perdido toda validez la calificación del proceso de referéndum como "cívico-educativo". *Forzoso es reconocer su verdadera naturaleza político-partidista y detener semejante campaña.*

Asombra ver cómo, en abierta violación a los elementales principios de sentido común y equidad, la mayoría del Tribunal exige ahora *neutralidad* a los poderes políticos, pero permite que públicamente los jueces adopten una posición particular *contraria* en la contienda política, *enmendando* así la disposición constitucional que lo prohíbe. "El reclamo de independencia judicial no es una excusa para un relativismo ético e involucrar a los jueces en una campaña político-partidista. La mayoría ha transformado nuestra democracia en un Gobierno de sólo siete (7) jueces que, a título de 'hegemonía de magistrados', decide desde este estrado la constitucionalidad y validez de las leyes y, sin despojarse las togas, decide también qué enmiendas deben hacerse al Poder Judicial; si no gustan, a modo equivalente y funcional de un *Partido del Magistrado*, autoriza la figura del *Juez-Político* para que haga campaña en *contra*, usando todo el prestigio, poder y coacción que genera el cargo judicial." (Énfasis en el original.) *In re V. Limit. Const., Éticas Judicatura*, supra, pág. 709.

Esa actuación ha convertido en cosa del pasado la fisonomía original del Poder Judicial que motivó a Alexander Bickel, en su obra *The Least Dangerous Branch*, a expresar que el capital de la Judicatura era su fuerza moral. Todo lo cual nos recuerda al genial William Shakespeare que puso en boca de Casio la siguiente interpelación: "La culpa ... no

está en nuestras estrellas, sino en nosotros mismos, es por eso que somos responsables ...."[5]

Ello no nos impide reconocer que el "país está atravesando momentos de gran dificultad y tensión. En estas trabajosas circunstancias, es imprescindible que se actúe con serenidad y sensatez. Lo vital es que triunfe el Pueblo entero de Puerto Rico; que no se reduzca la calidad de su democracia ni se mancille la limpieza de sus procesos electorales; que se respeten escrupulosamente nuestra Constitución y nuestras leyes. Hacemos un llamado al país para mantener en toda ocasión la máxima tranquilidad y mesura". *P.P.D. v. Barreto Pérez*, 110 D.P.R. 376, 387 (1980). En ese espíritu, es imperativo que recíprocamente los partidos políticos y sus dirigentes respeten las instituciones y la dignidad humana de sus integrantes. "Las diferencias y los conflictos no perturban la solidaridad de los seres humanos en el bien común sino que, por el contrario, la fortalece y afianza." 4 Diario de Sesiones de la Convención Constituyente 2563 (1961).

Por los fundamentos expuestos, en recta juridicidad, procedía decretar la inconstitucionalidad del referéndum y ordenar su paralización.

— O —

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

La Opinión y Sentencia que hoy se emite en los recursos del epígrafe constituye evidencia irrefutable de que la mayoría de los integrantes de este Tribunal, *aparentemente cegada por una arrogancia judicial realmente difícil de comprender*, se ha olvidado de: *que* el poder último en este País *reside en el pueblo* y que *éste ejerce el mismo a través*

---

[5] Citado por M.J. López Mesa y L.A. Valente, *El Negocio Jurídico*, 1992-E Rev. Jur. Arg. La Ley 965, 979 (1992).

*de los funcionarios que tiene a bien elegir* cada cuatro (4) años; *que,* precisamente debido a ello, *la legislación* que promueve y aprueba tanto el Gobernador como los miembros de la Asamblea Legislativa *representa el sentir mayoritario de ese pueblo* en un momento determinado de su historia; *que* la función principal de este Tribunal, como tribunal de última instancia e intérprete máximo de nuestra Constitución, es la de examinar la validez, y no la sabiduría, de la legislación que es aprobada y endosada por las otras dos (2) Ramas del Gobierno en cumplimiento del sentir y mandato del pueblo; *que* venimos obligados a ejercer esa facultad de interpretación y análisis a la luz de, y dentro de los parámetros establecidos por, esa Constitución, *y que* el pueblo tiene el *poder,* la *facultad* y el *derecho absoluto de enmendar la Constitución,* derecho que viene obligado a acatar y respetar este Tribunal aun cuando sus integrantes sean del criterio que las enmiendas propuestas no son muy atinadas y/o convenientes.

En otras palabras, y dicho de la manera más sencilla posible, *el gran poder que la Constitución del Estado Libre Asociado de Puerto Rico le concede a este Tribunal no constituye "carta blanca" para abrogarnos la facultad de pretender gobernar este País desde el estrado judicial que ocupamos.* Ello le corresponde, dentro del sistema republicano de gobierno que rige en nuestro País, a las Ramas Ejecutiva y Legislativa del Gobierno de Puerto Rico. *No entender ese hecho, hacer caso omiso del mismo, apartarnos de nuestro correcto camino, actuar en violación de la Constitución, constituye no sólo la negación de nuestra propia existencia y razón de ser sino que tiene la grave consecuencia de causar que el pueblo pierda la fe en la justicia que este Foro dispensa mediante las decisiones que emite.*

Estamos conscientes del hecho de que la Mayoría precisamente sostiene que, al resolver como hoy lo hace, no está actuando *ultra vires* sino que, por el contrario, lo que está haciendo es descargando su función judicial de evaluar la

constitucionalidad de una ley. *Sin embargo*, y a poco que examinemos desde un punto de vista jurídico y objetivo la decisión mayoritaria emitida, nos podremos dar cuenta de que ello *no es correcto. Esto es, la Mayoría está declarando inconstitucional parte de la Ley Habilitadora del Referéndum sobre Enmiendas a la Constitución de Puerto Rico de 1994* (en adelante Ley Habilitadora) *en forma caprichosa y errónea; privando de esa forma no sólo al pueblo de expresar su preferencia sobre un asunto de gran interés público, sino que trastocando, y desestabilizando, la celebración del mencionado referéndum.*([1])

I

Una lectura cuidadosa y objetiva de los recursos radicados por los apelantes Partido Independentista Puertorriqueno, Partido Popular Democrático, y el "peticionario" Báez Galib, demuestra que los planteamientos o señalamientos de error de éstos, que pudieran tener algún mérito, se pueden resumir en cuatro (4),([2]) a saber:

(1) que la proposición relativa a la fianza contraviene la disposición constitucional que consagra la presunción de inocencia y la que prohíbe los castigos crueles e inusitados;

(2) que la Ley Habilitadora en controversia —al fijar una suma máxima de contribuciones financieras, la suma de mil dólares ($1,000), que puede hacer una persona na-

---

([1]) Ello ya lo habíamos pronosticado el pasado 2 de septiembre de 1994. Expresamos entonces, en lo pertinente, que:

"La *determinación mayoritaria* que hoy se hace por el Tribunal constituye, a nuestro juicio, aviso suficiente *para el "buen entendedor"* —aquél para quien "con pocas palabras basta"— de que la mayoría de los integrantes del Tribunal, con toda probabilidad, *ya decidió* declarar inconstitucional la Ley Núm. 49 de 2 de agosto de 1994 (16 L.P.R.A. sec. 956 *et seq*.), conocida como la Ley Habilitadora del Referéndum sobre Enmiendas a la Constitución de Puerto Rico de 1994 (en adelante Ley Habilitadora del Referéndum de 1994) *y/o enmendar judicialmente la misma a su antojo*, y que todo lo que falta es *meramente* que la Mayoría *plasme por escrito* dicha determinación mayoritaria." (Énfasis suplido y en el original.) *P.P.D. v. Gobernador I*, 136 D.P.R. 861, 873 (1994).

([2]) Resumen que hacemos con el único propósito de no hacer muy extensa la ponencia.

tural o jurídica a un partido político— resulta violatoria del derecho de los ciudadanos a la libertad de expresión;

(3) que la referida Ley Habilitadora violenta las disposiciones de la Sec. 1 del Art. VII de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, al permitir que se presente a la consideración del electorado más de tres (3) proposiciones; específicamente debido a la proposición relativa a la limitación de términos para los cuales ciertos funcionarios pueden ser electos a sus cargos, y

(4) que el esquema de aportaciones financieras plasmado en la referida Ley Habilitadora es inconstitucional no sólo porque no le asigna fondos públicos a los partidos políticos sino porque trata, en forma desigual, a las agrupaciones cívicas que no cualifican como partidos.

## II

En relación con el *primero* de los señalamientos —*esto es, el relativo a la proposición sobre la eliminación del derecho absoluto a la fianza*— resulta *palpablemente obvio* que la eliminación del derecho absoluto a la fianza *no* infringe, de modo alguno, la disposición constitucional sobre presunción de inocencia. Como acertadamente expresa, en lo pertinente, el Prof. Ernesto Chiesa:[3]

> La presunción de inocencia *es una norma de derecho probatorio sobre obligación de presentar evidencia y obligación de persuadir.* Es una norma fundamental. *Pero es insuficiente y de poco valor en cuanto a la determinación de los derechos del acusado en la zona de detención preventiva.* Iniciada la acción penal con la determinación de causa probable para el arresto, *el Estado tiene razones de mucho peso para tomar medidas que tiendan a asegurar que el imputado no ha de escapar y ha de comparecer a juicio, y hasta para tomar medidas de protección social en ciertos casos.* La presunción de inocencia *protegerá al acusado en el juicio, pero no será obstáculo para que el Estado*

---

[3] E.L. Chiesa Aponte, *Derecho procesal penal de Puerto Rico y Estados Unidos,* Colombia, Ed. Forum, 1992, Vol. II, pág. 447.

*limite de alguna manera la libertad del imputado mientras es sometido a juicio.* (Énfasis suplido.)[4]

En cuanto al *segundo* de los planteamientos —*esto es, que la limitación impuesta de mil dólares ($1,000), como contribución máxima que un ciudadano le puede hacer a un partido político para la campaña del referéndum, viola el derecho de los ciudadanos a la libre expresión*— la situación *resulta ser análoga.*

La razón, fundamento o propósito legislativo detrás de la acción de la Asamblea Legislativa fijando "topes" para la contribución que una persona, natural o jurídica, le pueda hacer a un partido político en particular en relación con una campaña política *resulta ser obvia.* Se persigue con dicha disposición estatutaria *evitar que personas adineradas o poderosas corporaciones, con posterioridad a una campaña política, puedan ejercer presión indebida sobre los partidos, o los políticos, a los cuales le facilitaron grandes sumas de dinero antes, y durante, la campaña, con el objetivo de que éstos le concedan favores.*

Es por ello que resulta, *particularmente*, irónico que sea el Partido Popular Democrático el que impugne, en los recursos ante nuestra consideración, la constitucionalidad de esa disposición estatutaria. Dicho partido político, *en sus comienzos en la década de los cuarenta* (40), tenía como lemas principales, entre otros, el de "vergüenza contra dinero"; "no vendas tu voto a los 'colmillú' "; etc. *Hoy en día parece ser que dichos lemas, y actitudes, han quedado atrás olvidados.*

Dicha disposición estatutaria, *repetimos*, tiene el propósito o interés principal de *evitar* que personas, o corporaciones, poderosas y adineradas *controlen* el proceso político puertorriqueño. *La eliminación o invalidación de la misma, a nuestra manera de ver las cosas, representaría regresar a una etapa o época, ciertamente triste y bochor-*

---

[4] La alegación respecto a que dicha propuesta enmienda constituye un "castigo cruel e inusitado" es tan inmeritoria que no vale la pena discutirla.

*nosa, que ya superamos como pueblo; hecho del cual nos debemos sentir, todos, orgullosos.*

Estamos conscientes de que se aduce, en apoyo de la impugnación del referido tope o limitación, la decisión que emitiera el Tribunal Supremo de los Estados Unidos en el caso de *Citizens Against Rent Control v. Berkeley*, 454 U.S. 290 (1981); caso en el cual dicho alto Foro federal resolvió que un "tope" de doscientos cincuenta dólares ($250), que una ciudad estadounidense había impuesto en relación con la celebración de un referéndum, violaba el derecho a la libertad de expresión de los ciudadanos de dicha ciudad. Debe destacarse el hecho de que una lectura de la referida decisión demuestra que el Supremo nacional entendió —que aun cuando dicho tope, de ordinario, no resulta violatorio del derecho de expresión y que el establecimiento de estos topes tiene el propósito de preservar la pureza del procedimiento electoral— dado el hecho de que la ley allí en controversia exigía la publicación de los nombres de las personas que contribuyeran a la campaña con sumas mayores que las allí permitidas,(5) no existía el riesgo o peligro de que la pureza del referéndum allí en controversia se afectara. En otras palabras, el Supremo federal entendió que los *disclosure requirements* contenidos en la ordenanza allí impugnada contituían suficientes medidas de prevención (*prophylaxis*) para dispersar cualquier apariencia o percepción de corrupción. Ese, a nuestro juicio, fue el *factor principal y determinante* en la decisión emitida en el citado caso de *Citizens Against Rent Control v. Berkeley*, ante.

La situación hoy ante nuestra consideración es claramente distinta a la del caso de *Citizens Against Rent Control v. Berkeley*, ante, *lo que hace que el mismo pueda y deba ser distinguido del caso de epígrafe.* En primer lugar, tan reciente como el pasado 8 de septiembre de 1994, este

---

(5) La ley habilitadora del referéndum en controversia en el caso de *Citizens Against Rent Control v. Berkeley,* 454 U.S. 290 (1981), a pesar de que establecía un tope de doscientos cincuenta dólares ($250), exigía que el nombre de toda persona que contribuyera con más de cincuenta dólares ($50) fuera publicado.

Tribunal resolvió, en un incidente interlocutorio dentro del presente caso,[6] que —para efectos de la aplicación al referéndum en controversia de una disposición de la Ley Electoral de Puerto Rico,[7] que por sus propios términos únicamente es aplicable a las elecciones generales— *no* existía diferencia alguna en nuestra jurisdicción entre la celebración de un referéndum y una elección general. Cobra importancia, en consecuencia, el hecho de que en el caso de *Citizens Against Rent Control v. Berkeley*, ante, el Supremo federal resolvió que la violación al derecho de expresión *no* se daba cuando se trataba de una elección general. *Por otro lado*, no es, ni sería, la primera vez en que este Tribunal, en protección de los derechos de la ciudadanía en general "posterga" un derecho individual protegido por la Constitución. Un buen, y reciente, ejemplo de ello lo es la decisión que este Foro emitiera en *Caquías v. Asoc. Res. Mansiones Río Piedras*, 134 D.P.R. 181 (1993); caso en que el Tribunal obvió derechos tales como el de la libre asociación, la libertad de movimiento, etc., en protección de la seguridad, y bienestar general, de los ciudadanos de una urbanización que cerraron los accesos a la misma.

En resumen, siendo el *propósito legislativo*, detrás de la disposición estatutaria que impone un "tope" a las contribuciones que los ciudadanos le puedan hacer a un partido político en el referéndum en controversia, *la de preservar* · *la pureza del derecho al sufragio en Puerto Rico*, somos del criterio que la *validez* de dicha disposición estatutaria *puede ser sostenida* en cualquier foro judicial; esto es, tenemos plena confianza en que el Supremo federal, de serle planteado el asunto, sostendrá la validez de la misma, dados los hechos particulares envueltos en el presente caso. De todas formas, estamos en disposición de "corrernos" ese riesgo. *Preferimos, mil veces, ser revocados a reinstalar en*

---

[6] *P.P.D. v. Gobernador II*, 136 D.P.R. 917 (1994).

[7] Art. 8.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3351.

*Puerto Rico el bochornoso procedimiento de la compra de influencias políticas por parte de los ricos y poderosos.*

En cuanto al *tercer* señalamiento —esto es, de que la Ley Habilitadora adolece del defecto constitucional de presentar al electorado más de tres (3) proposiciones en un mismo referéndum; *en específico*, a los efectos de que la proposición sobre la limitación de los términos a los miembros de la Asamblea Legislativa, a los alcaldes y al Gobernador *envuelve* tres (3) asuntos diferentes en lugar de uno (1)— se aduce, tanto por los apelantes como en la opinión mayoritaria que emite el Tribunal declarando inconstitucional dicha proposición, que ello es así por cuanto un elector podría querer "favorecer la limitación de los términos en cuanto a uno (1) o dos (2) de los cargos y no en cuanto a todos".[8]

La proposición que limita los términos a los cuales puede ser electo el Gobernador, los miembros de la Asamblea Legislativa y los alcaldes *no es inconstitucional.* La Mayoría, acogiendo la errónea posición sostenida por los apelantes, resuelve que la misma viola la disposición constitucional, contenida en la Sec. 1 del Art. VII de la Constitución, *supra*, ed. 1982, pág. 380, que establece, en lo pertinente, que "[c]ada proposición de enmienda deberá votarse separadamente *y en ningún caso se podrá someter más de tres proposiciones de enmienda en un mismo referéndum"*. (Énfasis suplido.) Sostiene la Mayoría, en síntesis y en lo pertinente, que la proposición relativa a la limitación de términos, contenida en la Ley Habilitadora, es inconstitucional "al presentar tres proposiciones de enmienda como una sola". *¿Es ello correcto?* Entendemos que no. Veamos por qué.

De entrada, debe señalarse que el historial y el debate habido en la Asamblea Constituyente respecto a esta disposición, y parte, específica de la Constitución *no* resulta de mucha ayuda. Dicho de otra forma, y como reconoce la

---

[8] Véase Opinión mayoritaria, pág. 221.

Opinión mayoritaria, los miembros de la Asamblea Constituyente no "definieron" ni "explicaron", el término "proposición" utilizada en la antes mencionada Sec. 1 del Art. VII de la Constitución.

Esa, posiblemente, sea la razón por la cual la mayoría de los integrantes del Tribunal reconoce que la determinación que haga un tribunal, respecto a esta cuestión, depende de la *evaluación individual* que haga ese foro "de la naturaleza particular de las proposiciones bajo su consideración". La mayoría de los integrantes del Tribunal, haciendo una "interpretación personal", de las proposiciones ante nos resuelve, como hemos visto, que la enmienda propuesta sobre limitación de términos no constituye una única proposición sino que envuelve tres (3) asuntos. Dicha *acomodaticia* "interpretación personal" nos hace recordar, no sabemos por qué, lo expresado por Ortega y Gasset a los efectos de que "yo soy yo y mis circunstancias".

La terminología utilizada al redactarse una constitución, por necesidad, es una de tipo general y abarcadora ya que sus disposiciones pretenden cubrir una gama de situaciones y el futuro de un pueblo. Es por eso que los tribunales al interpretar las mismas lo hacen, de ordinario, en forma liberal en lugar de restrictiva y taxativamente. *P.I.P. v. C.E.E.*, 120 D.P.R. 580 (1988); R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, 1ra ed., San Juan, Ed. C. Abo. P.R., 1986, Vol. 1, págs. 4–5. Ese, *precisamente*, debe ser el "norte rector" de este Tribunal al interpretar las disposiciones en controversia de la Sec. 1 del Art. VII de la Constitución, *supra*. Debe recordarse que la celebración de un referéndum, con el propósito de enmendar una constitución, *es un evento no sólo poco usual y extraordinario sino que sumamente costoso que este pueblo no puede darse el lujo de celebrar una y otra vez.*

Es por ello que la *regla general imperante* en aquellas jurisdicciones estatales que contienen disposiciones similares a la aquí en controversia, como correctamente señala el

Procurador General en su comparecencia, *es a los efectos de que una proposición de enmienda constitucional es válida, aun cuando la misma envuelva más de un (1) asunto, siempre que los asuntos incluidos en la misma sean germanos y que éstos persigan el mismo propósito general.* Véanse: *Milwaukee Alliance, etc. v. Elections Bd., etc.,* 317 N.W.2d 420 (1982); *City of Raton v. Sproule,* 429 P.2d 336 (N.M. 1967). *Y es que es lógico que ello así sea.* La norma general antes expuesta tiene el *obvio propósito* de evitar que el Gobierno tenga que celebrar varios plebiscitos, con el costo que ello conlleva, para enmendar la Constitución respecto a *asuntos relacionados* que tengan el *mismo propósito.*

En la cuestión hoy ante nuestra consideración, *resulta irrefutable* el hecho de que la proposición en controversia *persigue y tiene un sólo propósito general*: el de *limitar los términos* de los *principales funcionarios* que el pueblo elige en la *elección general* que se celebra *cada cuatro (4) años* en el País; esto es, el Gobernador, los miembros de la Asamblea Legislativa y los alcaldes. *Nada más lógico y razonable.* Resulta, inclusive, curioso que la jurisprudencia que, en apoyo de su errónea conclusión cita la Mayoría, sostiene nuestra conclusión. De una lectura de los casos citados en la Opinión mayoritaria se desprende que el *criterio rector* en estas situaciones lo es la "singularidad del propósito de la enmienda".

El argumento de la Mayoría, a los efectos de que dicha proposición es inconstitucional por razón de que *podría* existir un elector que quisiera votar afirmativamente para limitar la reelección en uno de los cargos y negativamente en cuanto a otros de los cargos allí mencionados, *no sólo es especulativo y erróneo sino que el mismo nos lleva a un absurdo.* En *primer* lugar *no* existe *prueba fehaciente* ante el foro judicial de la existencia de ese "elector". La parte demandante no presentó prueba sobre ello ante el foro de instancia. En *segundo* término, *siempre* podrá existir un elector que *no* está de acuerdo con *todo* lo que se propone

en una proposición como la impugnada. *Meramente a manera de ejemplo*, señalamos que si la proposición en su forma actual fuera solitariamente sometida ante la consideración del pueblo en un referéndum, siempre podrá existir un elector que, digamos, esté de acuerdo con la idea de la limitación propiamente de los términos pero no esté de acuerdo en cuanto al número específico propuesto de los términos —esto es, dos (2) o tres (3)— por los cuales se pretende limitar dicha reelección. Dicho de otra forma, bajo el argumento y razonamiento esbozado por la Mayoría, en apoyo de su equivocada conclusión de que la proposición en controversia es inconstitucional, *siempre* existiría el problema del *logrolling*.[9]

En relación con el *cuarto* señalamiento de inconstitucionalidad —a los efectos de que el esquema financiero que contiene la mencionada Ley Habilitadora es alegadamente inconstitucional debido a que no le asigna fondos a los partidos políticos y por razón de que discrimina contra agrupaciones que no cualifican como partidos políticos— procede que se enfatice el hecho de que el mismo es *completamente* inmeritorio. Respecto al alegado discrimen de las agrupaciones cívicas en específico, *basta* con señalar que, como correctamente señala el Procurador General en su comparecencia, nuestra "historia electoral revela que el Estado siempre ha delegado en los partidos políticos reconocidos para que en unión a la agencia electoral del Estado administre los procesos electorales", habiendo ello sido siempre así "en todos los referéndums y plebiscitos [celebrados] antes y después de la Constitución"; *la validez de cuya situación, y actuación, siempre ha sido sostenida por este Tribunal.* Véanse: *P.R.P. v. E.L.A*, 115 D.P.R. 631

---

[9] Nos abstenemos de discutir, en los méritos, el señalamiento de los apelantes de *logrolling* relativo a la enmienda referente al aumento en la composición numérica del Tribunal Supremo. Dicho señalamiento es tan *obviamente frívolo* que ni aun la mayoría de los integrantes del Tribunal, la cual ha sido bastante osada en la disposición del presente recurso, se ha atrevido a considerarlo meritorio.

(1984); *P.P.D. v. Com. Estatal de Elecciones*, 110 D.P.R. 400 (1980).

Respecto al señalamiento de inconstitucionalidad por razón de que la mencionada Ley Habilitadora *no* le asigna fondos a los partidos políticos existentes en Puerto Rico, dicho planteamiento *podría* haber tenido alguna validez *antes* de la Opinión *per curiam* que este Tribunal emitiera —a nuestro juicio, en forma prematura— el pasado 8 de septiembre de 1994 en el caso ante nuestra consideración. Recordaremos que mediante la referida Opinión *per curiam* el Tribunal confirmó una resolución interlocutoria que había emitido el tribunal de instancia prohibiéndole a las agencias del Gobierno publicar anuncios sin el permiso de la Comisión Estatal de Elecciones; decisión que es ya final y firme.

Decimos lo anterior debido al hecho de que no hay duda de que, si las agencias del Gobierno estuvieran actualmente publicando anuncios sobre los alegados logros del Gobierno, los partidos políticos de oposición podrían estar en desventaja y podrían tener derecho a que se les concedieran fondos públicos para refutar dicha campaña gubernamental. *Eliminada, sin embargo, la posibilidad de publicación indiscriminada de anuncios por parte de las agencias del Gobierno, desaparece totalmente la necesidad de concederle fondos públicos a los partidos políticos de oposición.* Esto es, todos los partidos políticos reconocidos *están en igualdad de condiciones.* La única "parte" que está autorizada a gastar fondos públicos en la campaña del referéndum lo es la Comisión Estatal de Elecciones, *la cual es neutral.* Debe recordarse, *por último*, que la Ley Habilitadora permite que los partidos políticos lleven a cabo la campaña que entiendan pertinente siempre que sea con sus propios fondos.

Es por ello que resulta *verdaderamente sorprendente* la acción que toma el Tribunal en el día de hoy respecto a este asunto. *No hay duda de que la Mayoría está consciente de*

*la corrección del antes señalado argumento*; esto es, que *no* hay necesidad alguna de proveerle fondos públicos a los partidos políticos en estos momentos. Sin embargo, y *en un acto nunca antes visto de "legislación judicial" y obviamente conscientes de que su acción causará desasosiego y escaramuzas a nivel de la Comisión Estatal de Elecciones, lo cual tendrá la consecuencia inescapable de desestabilizar la celebración del referéndum*, le ordena a la referida Comisión: a abandonar la campaña neutral de información y orientación que en cumplimiento de la Ley Habilitadora venía llevando a cabo; a darle "participación plena, directa y efectiva a los Comisionados Electorales en todas las etapas de la campaña [de información], particularmente en su contenido" (Opinión mayoritaria, pág. 230); a "divulgar de forma masiva unos mensajes educativos donde *se les explique a todos los electores el significado de las enmiendas y las razones para votar a favor y en contra de cada una de ellas*" (énfasis suplido.) íd., pág. 203; en cuya gestión "la Comisión Estatal *deberá gastar cantidades iguales para la divulgación de las razones a favor y en contra de cada una de las enmiendas propuestas*", (énfasis suplido.) íd., pág. 230, y a darle participación "a las agrupaciones que hayan acreditado su interés en participar en el proceso electoral" (íd.). *"Cosas raras veredes"*, dijo algún filósofo en forma chistosa.

III

El *zigzagueante* y *erróneo* curso de acción que ha seguido el Tribunal a través de todas las diferentes etapas del presente caso —*actuación que culmina en el día de hoy, repetimos, con la determinación de inconstitucionalidad parcial de la Ley Habilitadora y con el asombroso acto de legislación judicial que se lleva a efecto en la parte final de la Opinión mayoritaria emitida*— conlleva, no hay duda, *un mensaje claro y preciso a las restantes Ramas del Go-*

*bierno de Puerto Rico.* La mayoría de los integrantes del Tribunal ha dejado hoy *claramente establecido* que entiende que tiene el *poder último* en nuestro País *y que está en disposición de enmendar, rehacer y deshacer —a su antojo y capricho— el fruto o producto final del trabajo y labor de las Ramas Ejecutiva y Legislativa de nuestro Gobierno.* Esto es, en el día de hoy el Tribunal *hace alarde del "mollero judicial", que entiende posee y que obviamente está en disposición de utilizar, respecto a las labores y funciones que la Constitución expresamente delega en el Poder Ejecutivo y la Rama Legislativa.* Resulta *verdaderamente lamentable* que ello haya sucedido.